JOHN B. WHITE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4714–68.    Filed February 4, 1971.

*Marvin J. Levin*, for the petitioner.
*Giles J. McCarthy*, for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined a deficiency of $27,819.91 in the taxpayer's income tax for the calendar year 1965 and a 10-percent addition to the tax under section 6651(a), I.R.C. 1954, in the amount of $2,781.99. The issues for decision are whether an incentive payment made by Ford Motor Co. is income to the taxpayer under section 61, I.R.C. 1954, and if so, whether it is excludable from the taxpayer's gross income as a contribution to capital under section 118. There is no dispute about the section 6651(a) addition to tax; the propriety of that addition depends entirely upon the correctness of the basic deficiency. The facts have been stipulated.

The taxpayer, John B. White, Inc. (White), is a corporation organized under the laws of the Commonwealth of Pennsylvania. At all times relevant to the proceedings herein, it has maintained its principal place of business in Philadelphia, Pa. White filed its Federal corporate income tax return for the calendar year 1965 with the district director of internal revenue at Philadelphia, Pa., on April 21, 1966. The timely filing date for the return was March 15, 1966. White maintained its books and prepared its return on a calendar year basis and on an accrual method of accounting.

On February 1, 1955, White executed a form "Ford Sales Agreement" with Ford Motor Co. (Ford), a Delaware corporation with its principal place of business at Dearborn, Mich. Under the agreement, White (identified therein as "Dealer") was designated as an authorized Ford dealer. The preamble to the instrument (which identified Ford as "Company") provided in part:

Company has created a line of quality motor vehicles bearing the trade-mark "Ford" and parts, accessories and equipment therefor. These products are distributed and serviced primarily by authorized dealers. There has been established and maintained over a period of many years the good will of the public toward Company, its products and its dealers. The success of Company and the success of its dealers are dependent upon the continuation of this good will. In order to maintain and further this good will, it is essential that all dealers give prompt, satisfactory and courteous service to their customers, treat their customers fairly, and handle complaints properly.

Company has built and acquired, and is continuing to build and acquire, extensive plants, facilities and tooling necessary to the production and distribution of its products on a competitive basis, and has made, and is continuing to make, large investments in engineering and research for the improvement of its products. In order for Company and its dealers to obtain maximum benefits from such plants, facilities, tooling, engineering and research, it is essential that each dealer in the products of Company possess the qualifications, personnel and facilities requisite to cultivating and developing the market to its full potential in his locality, assume and carry out the obligation and responsibility for thus cultivating and developing the market, and adopt sound management practices in the conduct of his business.

In order to assist its dealers to achieve maximum results, Company has made available, and will continue to make available, to its dealers experience and technical knowledge that it has acquired and developed over the years with respect to the merchandising and servicing of automotive vehicles, parts, accessories and equipment; has offered, and will continue to offer, to its dealers advice, information and guidance with respect to management, finance, merchandising and service in a dealership; and has employed, and will continue to employ, various means to assist its dealers to achieve success in their businesses. It is deemed desirable and in the best interests of the dealers and Company that the dealers adopt a uniform accounting system in order that Company may be able to evaluate the relative operating performance of each of the dealers and to develop standards that will enable the dealers to obtain the most satisfactory results from their businesses.

Since the dealers are the primary retail sales outlet for Company's products, it is essential that the dealers periodically furnish to Company reports and estimates with respect to their respective operations and future requirements to the end that Company may make its commitments for raw materials and plan the production and distribution of its products in line with potential retail sales.

The preamble also recited that White's stock was held by John B. White (43 percent), J. W. Fullem (43 percent), and M. M. Bennett (14 percent).

The dealership established by the agreement was nonexclusive; Ford reserved the right to make sales to other dealers, and White reserved the right to make purchases from others. Under the agreement White was required, *inter alia*, to (1) sell and service Ford products in a manner satisfactory to Ford; (2) "establish, maintain, and equip a place or places of business, including a salesroom, service facilities and a used passenger automobile and truck outlet, in a manner satisfactory to [Ford] * * * and display conspicuously thereat an assortment of Ford signs reasonably satisfactory to [Ford]"; (3) employ adequate trained sales and service personnel, and send representative employees to training schools conducted from time to time by Ford; (4) maintain an accounting system in accordance with the "Manual of Accounting Procedure for Ford Dealers"; (5) furnish Ford with monthly financial statements and with other periodic reports describing its operations; (6) maintain a stock of new automobiles, trucks, and chassis, as determined by a formula specified in the agree-

ment, as well as adequate stocks of Ford parts and accessories; (7) maintain regular contact with owners and users of Ford products within its "locality"; (8) conduct business "in a manner that will reflect favorably at all times on" Ford, its products, and its reputation; (9) allow Ford representatives to examine its place of business and its records and to test its equipment and facilities; and (10) contribute certain sums to the "Cooperative Ford Dealers' Advertising Fund," administered by Ford.

The agreement expressly provided that it did not establish an agency relationship between Ford and White:

> This agreement does not in any way create the relationship of principal and agent between Company and Dealer; and under no circumstances shall Dealer be considered the agent of Company. Dealer shall not act or attempt to act, or represent himself, directly or by implication, as agent of Company or in any manner assume or create, or attempt to assume or create, any obligation on behalf or in the name of Company.

The following provision, designed to limit Ford's liability for expenditures made by White, was also included in the agreement:

> The requirements of this agreement as to the facilities to be supplied by Dealer, as to the conduct of the business of dealing in COMPANY PRODUCTS and as to relationships between Dealer and others are intended only to protect the good name, good will and reputation of Company, to assure Company that its products will be made available to the public and that service facilities will be made available to users of its products, and to assure or inform Company of the financial stability of Dealer. This agreement contemplates that Dealer shall acquire Dealer's own place or places of business, facilities and equipment in accordance with Dealer's own discretion and shall purchase COMPANY PRODUCTS as Dealer's own and resell them to customers selected by Dealer, all in conformity with the requirements and limitations herein specified but otherwise in Dealer's own discretion. Except as herein specified, nothing herein contained shall impose any liability on Company for any expenditure made or incurred by Dealer in preparation for performance or in performance of Dealer's obligations under this agreement.

From February 1, 1955, until September 15, 1965, White's business operations were conducted at 4920 North Broad Street in Philadelphia. On June 14, 1965, Ford's District Sales Manager, W. S. Walla, sent the following letter to John B. White, president of the corporation:

> The proposed relocation of your Ford dealership from 4920 North Broad Street, Philadelphia 41, Pennsylvania, to the facilities currently occupied by H. B. Robinson at 6600 North Broad Street, Philadelphia, Pennsylvania, has been approved by the Ford Division.
>
> Further, approval has been granted to repurchase from John B. White, Inc., tools and equipment and signs in the amount of $20,000 within the limitations of Paragraph 21 of the Ford Sales Agreement, and to pay $59,290 in a lump sum for leasehold improvements and eligible premises assistance within the terms of Paragraph 22 of the Ford Sales Agreement, for a total of $79,290, as an incentive

to complete this relocation. This payment will not be processed, however, until the actual relocation is accomplished.

Ford offered the $59,290 incentive payment in order to increase the sales of its products and enhance its image by having White's dealership located in a more desirable neighborhood and in a more attractive and better equipped building than its current location. The reference to the "Ford Sales Agreement" in the letter was intended to refer to a 1960 revision of the form agreement which Ford and White had executed in 1955. Paragraph 22 of the revised form required Ford to assist the dealer in selling or leasing its business premises if the sales agreement had expired and not been renewed by Ford or if the agreement had been terminated by Ford under specified circumstances. "Eligible premises" were properties which qualified for assistance under the agreement. The "Ford Sales Agreement" which Ford and White had executed in 1955 also contained provisions providing for such assistance. Ford and White subsequently executed the revised form agreement on December 27, 1965.

White continued to conduct its business at 4920 North Broad Street through September 15, 1965. On September 16, 1965, White moved the business to leased premises at 6600 North Broad Street in Philadelphia. During 1965 White spent $57,335.59 on leasehold improvements at its new location, and on its books, it charged that amount to a leasehold improvement account. In 1966 White spent an additional $2,051.45 for leasehold improvements, bringing its total expenditures for leasehold improvement to $59,387.04.

It does not appear that Ford held stock in White during 1965.[1] During that year White received a total of $79,290 from Ford in accordance with the letter of June 14, 1965. On its Federal corporate income tax return for 1965, White reported $20,000 of the $79,290 as ordinary income to the extent that it exceeded the adjusted basis of the tools and equipment which Ford had repurchased. However, White did not include the remaining $59,290 in income on its return. It credited that amount on its books to a leasehold improvement account, and on its 1965 income tax return, it reduced the cost of leasehold improvements by that amount, presumably in reliance upon sections 118 and 362(c)(2), I.R.C. 1954. The return disclosed no tax due for the calendar year 1965.

In his statutory notice of deficiency, the Commissioner determined that the sum of $59,290 received from Ford was income to White in 1965 and increased White's taxable income by that amount. In addi-

---

[1] Although the record is not entirely clear in this respect, the parties have not suggested otherwise. Indeed, the arguments of both parties assume that Ford held none of White's stock in 1965, and we accept this for the purposes of this case.

tion, he determined that White was entitled to a deduction of $1,274.12 for amortization of leasehold improvements made in 1965. The Commissioner also determined that since the return was not filed within the time prescribed and since White had not shown that its failure to file on time had been due to reasonable cause, it was liable for a 10 percent addition to the tax due pursuant to section 6651(a).

The central dispute in this case concerns the proper tax treatment of the $59,290 incentive payment. Since the parties have stipulated that White's 1965 return was not timely filed, the addition to tax is in issue only because the amount of tax due, upon which the addition to tax is computed as a percentage, is in question. White's position with regard to the incentive payment is that the payment is not income to it within the meaning of section 61, I.R.C. 1954, and alternatively that even if it is income, it is excludable from gross income as a contribution to capital under section 118. We disagree with both arguments.

1. "Gross income," as defined by section 61(a), "means all income from whatever source derived." In enacting it and its statutory predecessors, Congress exerted "the full measure of its taxing power," *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426, 429–432; *Helvering* v. *Clifford*, 309 U.S. 331, 334; *Helvering* v. *Midland Mutual Life Ins. Co.*, 300 U.S. 216, 223; *Douglas* v. *Willcuts*, 296 U.S. 1, 9; *Irwin* v. *Gavit*, 268 U.S. 161, 166; H. Rept. No. 1337, 83d Cong., 2d Sess., A18 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess., 168 (1954), and intended to "tax all gains except those specifically exempted." *Commissioner* v. *LoBue*, 351 U.S. 243, 246; *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. at 430. Thus, in holding that the punitive element of a damage award constituted taxable income, the Supreme Court stated that punitive damages were income because they represented "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Glenshaw Glass Co.*, 348 U.S. at 431. Likewise, in the case now before us, Ford's incentive payment enhanced White's wealth by enabling it to acquire suitable facilities at an improved location for its dealership.

White's contention that the incentive payment is not income rests upon an analogy which it has attempted to draw between the facts of this case and situations where a lessee has been reimbursed or has a right of reimbursement against a lessor for expenses which the lessee has incurred for improvements made upon the leased property. In such cases it has been held that since the lessor is ultimately liable for the expenditures in question, the expenditures are not deductible or depreciable by the lessee. See, e.g., *Levy* v. *Commissioner*, 212 F. 2d 552 (C.A. 5), affirming a Memorandum Opinion of this Court; *379 Madison Ave., Inc.*, 23 B.T.A. 29, 41–42, reversed on other grounds

60 F. 2d 68 (C.A. 2).[2] It follows, the argument continues, that in such cases, the reimbursement from the lessor would not be treated as income to the lessee. White urges that the same treatment be accorded here to the payment from Ford.

The cases cited have only limited relevance to the problem before us. In each of them, the expenditure made by the lessee was made on behalf of the lessor; the lessor had already agreed to pay for the improvements in question, and the funds were used to improve the lessor's property. Thus, the lessor's payment in each of those cases would enhance the value of its own property; and in making its expenditure, the lessee was simply acting on behalf of the lessor, the party which would ultimately pay for and benefit from the expenditure. Here, on the other hand, White was not acting on behalf of Ford. The "Ford Sales Agreement" expressly disclaimed an agency relationship between the parties, and also provided that White would acquire its own place of business, facilities, and equipment. The leasehold improvements were thus the property of White, not of Ford. Accordingly, the incentive payment, which financed the improvements, was an undeniable accession to White's wealth and is includable in its income under section 61(a).

2. White contends that even if the payment otherwise qualifies as income under section 61, it is nevertheless excludable from gross income under section 118 of the 1954 Code [3] as a contribution to capital. Indeed, it places primary reliance upon this point.

In amplification of section 118, regulations section 1.118-1 provides in part:

Section 118 also applies to contributions to capital made by persons other than shareholders. For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, or to subsidies paid for the purpose of inducing the taxpayer to limit production. * * *

The distinction thus drawn by the regulations between expenditures made in return for such direct benefits as goods or services and pay-

---

[2] White also relies upon the treatment accorded by regulations sec. 1.168-5(a)(5) to amounts received from the United States as reimbursement for the cost of emergency facilities. The regulations were promulgated under a very specialized statute and deal with a problem far different from that presented here. In our judgment, the problem there considered is too far removed from the present case to be of assistance here.

[3] SEC. 118. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION.

(a) GENERAL RULE.—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.

(b) CROSS REFERENCE.—

For basis of property acquired by a corporation through a contribution to its capital, see section 362.

ments made in return for the indirect benefits of generally increased business in the community is reflected in the case law which section 118 was intended to codify. Compare *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98, with *Brown Shoe Co.* v. *Commissioner*, 339 U.S. 583. See also *Teleservice Co.* v. *Commissioner*, 254 F. 2d 105 (C. A. 3), certiorari denied 357 U.S. 919; *Federated Department Stores, Inc.*, 51 T.C. 500, 518–519, affirmed 426 F. 2d 417 (C.A. 6); S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 18–19, 190 (1954).[4]

The parties herein have stipulated that Ford made the incentive payment to White in order to derive the benefits which it expected to flow from the relocation of White's dealership: increased sales of Ford products and enhancement of the Ford image. The importance of these benefits is underlined by the "Ford Sales Agreement," executed by both Ford and White in 1955, which recited that Ford's success was dependent upon its dealers' ability to maintain and develop Ford's goodwill and sales within their localities. Ford thus anticipated that as the result of the relocation of White's dealership, it would derive valuable direct benefits from improved sales and promotional activities. We conclude that Ford made the incentive payment in consideration for enhanced promotional activities by White through the use of its new facilities and the increase in the sale of Ford products which could reasonably be expected to follow; such payment is not excludable from White's income as a contribution to capital. See *Commissioner* v. *Arundel-Brooks Concrete Corp.*, 152 F. 2d 225 (C.A. 4);[5] see also *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98; *Teleservice Co.* v. *Commissioner*, 254 F. 2d 105 (C.A. 3), certiorari denied 357 U.S. 919.

White has relied primarily upon *Federated Department Stores, Inc.*, 51 T.C. 500, 518–519, affirmed 426 F. 2d 417 (C.A. 6), in support

---

[4] This [sec. 118] in effect places in the code the court decisions on this subject. It deals with cases where a contribution is made to a corporation by a governmental unit, chamber of commerce, or other association of individuals having no proprietary interest in the corporation. In many such cases because the contributor expects to derive indirect benefits, the contribution cannot be called a gift; yet the anticipated future benefits may also be so intangible as to not warrant treating the contribution as a payment for future services. [S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 18–19 (1954)].

[5] See *Brown Shoe Co.* v. *Commissioner*, 339 U.S. 583, 591 fn. 13:

"*Commissioner* v. *Arundel-Brooks Concrete Corp.*, 152 F. 2d 225 (C.A. 4th Cir. 1945), relied upon by the court below, involved only the issue whether the full cost of a concrete mixing plant, the construction of which was financed in part by payments from a nearby supplier of a raw material used in mixing concrete, was depreciable to the taxpayer; there was no 'contribution to capital' issue, the only question being one of cost basis. However, the payments in that case were made in consideration of service rendered. The construction of the concrete plant directly benefited the supplier of raw materials by insuring the use of its sole product by the taxpayer; the supplier was also served through a business affiliation with the parent of the wholly owned taxpayer in the form of an exclusive marketing arrangement which saved the supplier the expense of a sales organization. See *Arundel-Brooks Concrete Corp.*, v. *Commissioner*, 129 F. 2d 762 (C.A. 4th Cir. 1942)."

Cf. *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98, 100 fn. 2; *Denver & Rio Grande Western R.R. Co.*, 32 T.C. 43, 45, affirmed 279 F. 2d 368 (C.A. 10); *Commissioner* v. *Revere Land Co.*, 169 F. 2d 469, 482–483 (C.A. 3), certiorari denied 335 U.S. 853.

of its position. However, we think it distinguishable from the case presented here. There the Court held that payments made by a real estate developer to a taxpayer in order to induce it to operate a department store within the developer's shopping center were excludable from the taxpayer's income as contributions to capital. The Court of Appeals stated (426 F. 2d at 421) :

The payments by Sharpstown to taxpayer were admittedly made with the expectation that the existence of taxpayer's department store would promote Sharpstown's financial interests. However, this expectation was clearly of such a speculative nature that any benefit necessarily must be regarded as indirect. In all the cases relied on by the government, the contributions had a reasonable nexus with the services which it was the business of the recipient corporation to provide. Such is not this case. Under these circumstances, we agree with the Tax Court that any benefit expected to be derived by Sharpstown was so intangible as not to warrant treating its contribution as a payment to taxpayer for future services.

Here, on the other hand, Ford's payments clearly had a "reasonable nexus" with the services which White customarily provided: the sale and promotion of Ford products. Moreover, the benefits which Ford anticipated were neither "indirect" nor "intangible"; they were the very benefits which Ford relied upon on establishing authorized dealerships. To be sure, the line between the two classes of cases is a shadowy one, but in our judgment *Federated Department Stores* is on the other side of that line and is more to be associated with the cases of contributions by community groups with which section 118 was primarily concerned as disclosed by the legislative history.

Since we sustain the Commissioner's determination that the incentive payment from Ford is includable in White's income, we also uphold his determination with regard to the addition to tax.

*Decision will be entered for the respondent.*