Code of 1954) shall not be considered to be a loss incurred in a trade or business."

G.M. TRADING CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6983–91.        Filed July 25, 1994.

R. *James Curphy,* for petitioner.
T. *Richard Sealy III,* for respondent.

SWIFT, *Judge:* Respondent determined a deficiency in petitioner's 1988 Federal income tax and additions to tax as follows:

*Additions to tax*

| Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) |
|---|---|---|
| $289,141 | $14,457 | 50% of the interest due on the portion of the underpayment attributable to negligence |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement, the primary issue for decision involves the proper Federal income tax treatment of a so-called Mexican debt-equity-swap transaction.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner is a Texas corporation engaged in the business of buying, processing, and selling sheep and lamb skins. At the time the petition was filed, petitioner's principal place of business was in San Antonio, Texas.

For many years, petitioner's sheep and lamb skin processing operations were located at petitioner's plant in San

Antonio, Texas. Petitioner sells most of its processed sheep and lamb skins to customers in Europe and the Middle East.

In 1986 and early 1987, petitioner's president, Robert E. Melton, decided to move petitioner's lambskin processing operations to a new plant to be constructed in Acuna, Mexico, that would be owned and operated by a new Mexican subsidiary corporation (Mexican subsidiary). The new plant was to qualify under a Mexican Government-sponsored program that encouraged foreign corporations to establish in Mexico subsidiary corporations for the manufacture of export products. Corporations established under this program were referred to as maquiladoras.

To obtain funds for the Mexican subsidiary to use in buying land and equipment and in constructing a plant under the maquiladora program (a maquiladora plant), petitioner entered into what is referred to in the financial industry as a "Mexican debt-equity-swap transaction". In general, the type of Mexican debt-equity-swap transaction that is at issue herein involves the transfer or surrender to the Mexican Government by a U.S. company or by its Mexican subsidiary corporation of previously issued U.S. dollar-denominated debt (which debt represents a direct liability of the Mexican Government to the U.S. company or a liability of a Mexican company to the U.S. company that is guaranteed by the Mexican Government) in exchange for the transfer by the Mexican Government of Mexican pesos into a restricted account with the Mexican Treasury in favor of the Mexican subsidiary of the U.S. company.

Mexican pesos transferred into the restricted Treasury account of the Mexican subsidiary corporation are required to be used by the Mexican subsidiary to make investments in and to expand its business operations in Mexico.

In a Mexican debt-equity-swap transaction, the U.S. dollar-Mexican peso exchange rate that is utilized to compute the number of Mexican pesos to be credited to the Mexican Treasury account of the Mexican subsidiary is extremely favorable to the U.S. corporation and to its Mexican subsidiary corporation that is participating in the debt-equity-swap transaction.

Also, as part of the debt-equity-swap transaction, the new Mexican subsidiary corporation effectively transfers 100 percent of newly issued class B restricted stock to the Mexican

Government, and the Mexican Government immediately transfers this stock to the U.S. parent corporation.

During the year before us, the Mexican Government participated in debt-equity-swap transactions in order to reduce the total balance of outstanding U.S. dollar-denominated debt obligations that were guaranteed by the Mexican Government (Mexican foreign debt) (the interest on which was causing high inflation and rapid devaluation of Mexico's currency vis-a-vis other currencies) and to encourage foreign businesses to invest in plants and equipment in Mexico.

In general, U.S. companies participated in debt-equity-swap transactions in order to expand their business operations in Mexico on terms that were financially favorable. Through debt equity-swap transactions, U.S. companies could receive significantly more Mexican pesos with which to fund their business expansion in Mexico than they could receive, for the same price, by directly buying Mexican pesos with U.S. dollars on the open foreign exchange markets.

During the period at issue, because of general uncertainty regarding the Mexican Government's ability to repay its debt obligations, U.S. dollar-denominated debt obligations of or guaranteed by the Mexican Government were sold at a steep discount at a price equal to approximately 50 percent of the principal amount of the debt.

By participating in debt-equity-swap transactions, U.S. companies and their Mexican subsidiaries could purchase from other U.S. companies at the prevailing steep discount rate U.S. dollar-denominated debt that was owed or guaranteed by the Mexican Government and then sell or exchange such debt with the Mexican Government for Mexican pesos at a significantly reduced discount of 0 to 25 percent of the principal amount of the debt. The reduced discount rates associated with debt-equity-swap transactions were established on a case-by-case basis by the Mexican Ministry of Finance and Public Credit and representatives of the U.S. companies and were generally dependent upon the perceived benefit of each proposed investment to the Mexican economy. Anticipated improvements in Mexico's export business, level of employment, and level of technology were factors typically affecting the size of the discount associated with specific debt-equity-swap transactions.

On February 1, 1987, petitioner's directors unanimously resolved to form in Mexico a subsidiary corporation by the name of Procesos G.M. de Mexico, S.A. de C.V. (Procesos) to participate in a debt-equity-swap transaction and to contribute capital to Procesos for the purpose of having Procesos construct and operate a lambskin processing plant in Acuna, Mexico.

On May 19, 1987, Procesos was organized under the laws of Mexico for the above-stated purpose. On incorporation of Procesos, 1,000 shares of class A stock were issued. Petitioner was issued 996 shares, and four Mexican citizens were issued 1 share each. Each share was issued in exchange for 10,000 Mexican pesos (Mex$). As the initial capitalization of Procesos, petitioner contributed Mex$9,960,000 or approximately US$7,800. In the bylaws of Procesos, provision was made for issuing shares of a second class of stock (class B stock) that would also have a nominal value of Mex$10,000 per share and that would be subject to certain limitations described below.

On August 18, 1987, petitioner paid a fee of US$3,000 to the Mexican Government and was registered as a foreign investor in Mexico in order to participate in a debt-equity-swap transaction. On August 26 and 28, 1987, formal requests were submitted on behalf of petitioner and Procesos to the Mexican Ministry of Finance and Public Credit and to the Mexican National Commission on Foreign Investments for permission for petitioner to fund through a debt-equity-swap transaction the construction of a maquiladora plant to be owned and operated by Procesos.

On August 31, 1987, petitioner agreed to purchase from NMB Nederlandsche Middenstandsbank N.V. (NMB), an unrelated party, U.S. dollar-denominated debt of, or guaranteed by, the Mexican Government in the principal stated amount of US$1,200,000. Petitioner agreed to pay US$600,000 for this debt—reflecting the prevailing market discount rate of 50 percent of the principal face amount of U.S. dollar-denominated debt of the Mexican Government.

On September 28, 1987, the Mexican National Commission on Foreign Investments informed petitioner and Procesos that it had approved the request that petitioner be permitted to fund the construction of a maquiladora plant by participating in a debt-equity-swap transaction.

On October 6, 1987, the Mexican Ministry of Finance and Public Credit and representatives of petitioner and Procesos agreed that, through the proposed debt-equity-swap transaction, the Mexican foreign debt that petitioner had agreed to purchase in the principal stated amount of US$1,200,000 would be converted into Mex$1,736,694,000 reflecting a discount rate of only 13 percent of the principal stated amount of the debt. At the time of this transaction, Mex$1,736,694,000, in general, had a fair market value in U.S. dollars at the prevailing open market foreign exchange rate of US$1,044,000.

Between October 9 and October 27, 1987, petitioner and Procesos entered into contracts for construction of the maquiladora plant. The contracts related to acquisition of land, construction of the plant, and installation of equipment.

On October 19, 1987, a debt participation and capitalization agreement was entered into on behalf of petitioner, NMB, the Mexican Government, Procesos, and the Mexican Ministry of Finance and Public Credit. Under this agreement, all of the parties agreed to perform and to deem as having occurred simultaneously the various steps of the debt-equity-swap transaction.

On October 30, 1987, petitioner transferred US$540,000 to NMB's account at the Morgan Guaranty & Trust Co. in New York City. Petitioner used the US$540,000, together with a deposit of US$60,000 made on or about August 31, 1987, to purchase from NMB U.S. dollar-denominated debt of the Mexican Government in the stated principal amount of US$1,200,000 (reflecting the 50-percent market discount rate applicable to U.S. dollar-denominated debt obligations of the Mexican Government).

On November 5, 1987, as contemplated in the October 19, 1987, debt participation and capitalization agreement, the following additional transactions were consummated: (1) The Mexican Ministry of Finance and Public Credit deposited Mex$1,736,694,000 into a Treasury account established in Procesos' favor with the Government of Mexico. This, effectively, was a restricted interest-bearing bank account owned by Procesos with the Mexican Government acting as the bank. The number of pesos was computed based on the total stated principal amount of the Mexican foreign debt (namely, US$1,200,000) times the November 5, 1987, market foreign

exchange rate for Mexican pesos of Mex\$1,663.50/US\$ multiplied by 87 percent (to reflect the 13-percent discount that had been agreed to);[1] (2) Procesos transferred to the Mexican Government 173,670 shares of Procesos class B stock (one share for every Mex\$10,000, or remaining fraction of Mex\$10,000), which shares were then transferred to petitioner; and (3) the Mexican Government foreign debt that had just been purchased by petitioner in the principal amount of US\$1,200,000 and that was immediately surrendered to the Mexican Government was canceled.

All of the Mex\$1,736,694,000 transferred into Procesos' Treasury account accrued interest to be paid by the Mexican Government at a rate that reflected, among other things, the then-prevailing inflation rate in the Mexican economy and any reductions in the total value of Mexican pesos in the account caused by a reduction in the value of Mexican pesos vis-a-vis the U.S. dollar on the foreign exchange markets. For purposes of accruing interest, the principal amount of the pesos was not discounted or reduced in any way (i.e., the restrictions on Procesos' and petitioner's use of the pesos did not result in the accrual of interest on some lesser amount of pesos than had been credited to the account).

The interest rate was adjusted and interest was paid on the pesos in the Treasury account every 28 days. During the relevant years, the annual interest rates applicable to this account ranged from 40.28 percent to 152.88 percent.

Payments out of Procesos' Treasury account were restricted and were made on behalf of Procesos by the Mexican Treasury upon application by Procesos and upon confirmation by the Treasury that the requested payments related to construction of the maquiladora plant.

The shares of class B stock that were transferred by Procesos to the Mexican Government and that were then transferred by the Mexican Government to petitioner were subject to restrictions, among others, that precluded: (1) Ownership of the stock by a Mexican citizen or business entity before January 1, 1998; (2) redemption of the stock for cash on a basis or at a rate more favorable than the scheduled amortization rate of the debt that was canceled in the

---

[1] Eighty-seven percent times US\$1,200,000 equals US\$1,044,000; US\$1,044,000 times 1,663.50 equals Mex\$1,736,694,000.

debt-equity-swap transaction; (3) the payment of guaranteed dividends, irrespective of earnings and profits, to holders of the stock (unless such dividends were specifically authorized by Mexican law).

As a result of the debt-equity-swap transaction and the accrual of interest on the peso balance in the Treasury account through the end of 1988, the total number of Mexican pesos credited to Procesos' Treasury account was as follows:

| Attributable to | Mexican pesos |
|---|---|
| Debt-equity-swap | 1,736,694,000 |
| Interest 1987 | 179,351,524 |
| Interest 1988 | 218,677,110 |
| Total | 2,278,893,696 |

Petitioner's total cost of participating in the debt-equity-swap transaction was US$634,000, consisting of the US$600,000 used to purchase the U.S. dollar-denominated Mexican debt, the US$3,000 registration fee paid to the Mexican Government, and additional legal fees and related costs of US$31,000.

Between November 10, 1987, and June 17, 1988, several payments were made from Procesos' account with the Mexican Treasury for the acquisition of land, construction of the maquiladora plant, and the purchase (or installation) of equipment. As of June 17, 1988, as a result of these payments relating to the purchase and construction of the maquiladora plant, the balance in Procesos' Mexican Treasury account was reduced to Mex$1,897,970 (or US$815 at the open market foreign exchange rate).

The total cost to petitioner and to Procesos of constructing the maquiladora plant, including water and electricity and additions to the original building, was as follows:

| | Mexican pesos |
|---|---|
| Land | 193,718,487 |
| Buildings | 1,751,278,808 |
| Equipment | 12,000,000 |
| Furniture | 19,057,755 |
| Total | 1,976,055,050 |

The maquiladora plant began operating in the fall of 1988. By the time of trial, most of petitioner's lambskin processing operations had been shifted to the maquiladora plant.

The table below compares what petitioner and/or Procesos actually received for the US$600,000 as a direct result of petitioner's and Procesos' participation in the debt-equity-swap transaction with what they would have received had they exchanged, on the open foreign exchange market, the US$600,000 cash for Mexican pesos: [2]

| Transaction | Cost in US$ [1] | Pesos received |
|---|---|---|
| On debt-equity-swap | 600,000 | 1,736,694,000 |
| If exchanged on market | 600,000 | 998,100,000 |
| Difference | | 738,594,000 |

[1] As reflected in this table, petitioner's cost excludes $34,000 in costs that were incurred in order to participate in the debt-equity-swap transaction.

On its corporate financial records, Procesos recorded the Mex$1,736,694,000 credited to its Treasury account as a result of the debt-equity-swap transaction as a contribution to its capital, reflecting no discount or reduction in the amount or value of the pesos due either to the restrictions applicable to the pesos or to the restrictions applicable to the class B stock.

On its corporate financial records, petitioner reflected its investment in Procesos as an investment of US$600,000, the amount paid for the U.S. dollar-denominated Mexican Government debt (having a principal amount of US$1,200,000) acquired from NMB.

On petitioner's Federal income tax return for its taxable year ending January 31, 1988, no gain was reported with respect to the debt-equity-swap transaction. On an attachment to Schedule L (Balance Sheet), there was reflected US$611,790 as "Equity in Subsidiary".

On audit of petitioner's Federal income tax return for its taxable year ending January 31, 1988, respondent determined that petitioner had realized a taxable gain in the amount of US$601,745 as a result of petitioner's participa-

[2] The table does not take into account restrictions attached to use of the pesos which restrictions will be discussed later in this opinion; nor does the table reflect interest that was paid on the funds after they were paid into Procesos' Treasury account.

tion in the debt-equity-swap transaction. Respondent subsequently reduced such determination to $410,000 (namely, the US$1,044,000 respondent determined for the value of the Mex$1,736,694,000 that was transferred into Procesos' Treasury account reduced by petitioner's total cost of US$634,000).[3]

### OPINION

Generally, under section 1001(a), taxpayers must recognize as taxable income gain realized on the sale or exchange of property. Since debt constitutes property in the hands of the holder, an exchange of debt for other property is generally treated as a taxable exchange under section 1001. *Cottage Sav. Association v. Commissioner,* 499 U.S. 554, 559 (1991); *San Antonio Sav. Association v. Commissioner,* 887 F.2d 577, 581 (5th Cir. 1989), affg. T.C. Memo. 1988–204; *Emery v. Commissioner,* 8 T.C. 979, 985 (1947), affd. 166 F.2d 27 (2d Cir. 1948); *Girard Trust Co. v. United States,* 69 F. Supp. 874, 875 (E.D. Pa. 1946), affd. 166 F.2d 773 (3d Cir. 1948). Foreign currency constitutes property for Federal income tax purposes. *FNMA v. Commissioner,* 100 T.C. 541, 582 (1993); *National-Standard Co. v. Commissioner,* 80 T.C. 551, 558 (1983), affd. 749 F.2d 369 (6th Cir. 1984); see also sec. 1.1001–1(a), Income Tax Regs.

Respondent argues that the debt-equity-swap transaction before us is governed by the above general statutory scheme and that petitioner is taxable on the US$410,000 difference between petitioner's total US$634,000 cost of participating in the transaction and the US$1,044,000 alleged fair market value of the Mex$1,736,694,000 received in the transaction. See Rev. Rul. 87–124, 1987–2 C.B. 205, which involved a debt-equity-swap transaction of the type at issue herein and which treats the transaction as a taxable exchange by the U.S. corporation of the U.S. dollar-denominated debt that had been purchased and simultaneously exchanged for foreign currency.

With regard to the value of the pesos received, respondent argues that the restrictions applicable to the pesos received in this case were not significant and that the fair market value of the pesos received is to be computed simply by using

---

[3] US$1,044,000 less US$634,000 equals US$410,000.

the applicable Mexican peso-U.S. dollar foreign exchange rate on the date of the transaction, under which the Mex$1,736,694,000 would be valued at US$1,044,000.

Petitioner argues that the step transaction doctrine should apply and that thereunder the exchange of the U.S. dollar-denominated debt for the Mexican pesos that occurred in this case should be disregarded and subsumed as just one part of a larger "debt-for-equity" transaction with respect to which petitioner realized no gain. As petitioner sees it, the substance of the transaction before us constituted merely a contribution of capital in the amount of US$600,000 by petitioner to Procesos, followed by a purchase of the Mexican debt not by petitioner but by Procesos, followed in turn by an exchange between Procesos and the Mexican Government of the Mexican debt for the restricted Mexican pesos having a fair market value, due to the restrictions on the pesos and on the class B stock, of only US$600,000. Thus, petitioner argues that no gain was realized by either petitioner or Procesos on the debt-equity-swap transaction.

Alternatively, if gain was realized on the exchange of the Mexican debt for the Mexican pesos, petitioner argues that the gain should be regarded as having been realized not by petitioner but by Procesos and that the gain should be treated, under section 118, as a nontaxable contribution of capital by the Mexican Government to Procesos.

The evidence is clear that petitioner was a vital party to all aspects of the transaction. The purchase by petitioner of the U.S. dollar-denominated Mexican debt in the face amount of US$1,200,000 and the immediate surrender of this debt to the Mexican Government for cancellation was a requirement for the transfer by the Mexican Government of the Mex$1,736,694,000 into Procesos' Treasury account. Clearly, without the purchase of the U.S. dollar-denominated debt by petitioner and the surrender of the debt to the Mexican Government, the Mex$1,736,694,000 would not have been transferred into Procesos' Treasury account. Petitioner, not Procesos, purchased the debt with its funds and must be regarded as a vital participant in and a party to the transaction that resulted in the transfer of the Mex$1,736,694,000 into Procesos' Treasury account.

The substance of the transaction before us was the exchange by petitioner, either directly or through Procesos, of

the U.S. dollar-denominated Mexican debt that petitioner had purchased for the Mexican pesos. Petitioner's role in the transaction was not merely to provide US$600,000 in capital to Procesos, but to purchase the debt and to convert it into pesos. Petitioner's cost basis in the Mexican debt was US$634,000, and petitioner's gain, if any, on the exchange of the debt for the pesos is taxable.

As indicated, petitioner argues that under section 118 any gain associated with the receipt of the Mexican pesos should be regarded as a nontaxable contribution of capital by the Mexican Government to Procesos. Section 118 provides generally that gross income does not include contributions to the capital of a corporation. The regulations give as an example a contribution of land to a corporation by a governmental unit for the purpose of inducing the corporation to locate or expand its business in the local community. Sec. 1.118–1, Income Tax Regs. The authorities under section 118, however, make it clear that where property is transferred to a corporation by a governmental entity in consideration for specific and direct goods or services, the exclusion under section 118 is not available. *United States v. Chicago, B. & Q. R.R.,* 412 U.S. 401, 413 (1973); *Deason v. Commissioner,* 590 F.2d 1377, 1379 (5th Cir. 1979), affg. T.C. Memo. 1976–224; *Helvering v. Claiborne-Annapolis Ferry Co.,* 93 F.2d 875, 876 (4th Cir. 1938); *John B. White, Inc. v. Commissioner,* 55 T.C. 729, 736 (1971), affd. 458 F.2d 989 (3d Cir. 1972); sec. 1.118–1, Income Tax Regs.

In this case, the receipt by the Mexican Government of specific, direct, and quantifiable benefits (namely, the surrender by petitioner to the Mexican Government and the cancellation of the U.S. dollar-denominated debt in the face amount of US$1,200,000) in exchange for the transfer to Procesos of the Mex$1,736,694,000 disqualifies the transaction from treatment under section 118 as a nontaxable contribution of capital to Procesos by the Mexican Government.

With regard to the valuation question (namely, the amount of taxable gain petitioner realized as a result of the transaction), both parties focus on different aspects of the transaction. Petitioner focuses on the class B stock that petitioner received at the conclusion of the debt-equity-swap transaction, and petitioner argues that its value was no more than petitioner's total US$634,000 cost of participating in the

transaction. Petitioner argues and petitioner's expert testified that the restrictions on ownership of the class B stock, the restrictions on use of the pesos transferred into Procesos' Treasury account, and the arm's-length nature of the transaction, among other things, support petitioner's valuation of the class B stock.

Respondent focuses on the Mex$1,736,694,000 that Procesos received from the Mexican Government and on the value thereof as the basis for computing petitioner's gain on the transaction.

Respondent's expert, among other things, emphasizes that with regard to the Mex$1,736,694,000 received from the Mexican Government, through the required monthly adjustments to the interest rate accruing on the pesos (which adjustments took into account inflation and fluctuations in the Mexican peso-U.S. dollar exchange rate), petitioner and Procesos were effectively protected from inflation and exchange-rate losses associated with the pesos. Respondent's expert emphasizes that the pesos should not be discounted due to the use restrictions placed thereon because the designated use for the pesos was the intended use all along. Respondent's expert, in effect, suggests that once the pesos were credited to Procesos' Treasury account, the restrictions on the use of the pesos were not significantly different from restrictions typically placed on loan proceeds by financial institutions in disbursing loan proceeds relating to construction projects or project financing.

We agree with respondent. We conclude that the fair market value of the Mex$1,736,694,000 received in the transaction was US$1,044,000, reflecting the value of Mex$1,736,694,000 on the foreign exchange market on November 5, 1987. Our conclusion is based on the fact that the restrictions imposed on the Mex$1,736,694,000 that Procesos received and on the class B Procesos stock did not, in our opinion and on the facts of this case, have any significant negative impact on the value of the pesos.

The requirement that the pesos be used to acquire land and to construct a processing plant in Mexico reflected the intended use of the pesos and the purpose for which the pesos were acquired in the transaction and did not reduce Procesos' economic benefit from the pesos. Cf. *Eder v. Commissioner*, 138 F.2d 27, 28 (2d Cir. 1943), remanding 47

B.T.A. 235 (1942); *Marty v. Commissioner,* T.C. Memo. 1972–11. The fact that disbursements out of the Treasury account had to be approved by Mexican Government officials and were to be spread out over the construction period of the maquiladora plant does not justify a discount or reduction in the value of the pesos, nor a valuation of the pesos based on their value on the foreign exchange markets as of the day each separate disbursement was made from the Treasury account.

The Mexican pesos accrued interest in favor of Procesos at a rate that protected Procesos and petitioner from risks associated with inflation in Mexico as well as foreign exchange risks, and Procesos' and petitioner's use of the interest so accrued was not subject to any restrictions.

All of the Mex$1,736,694,000 accrued interest in favor of Procesos as of November 5, 1987, the date the Mexican Government deposited the pesos into the Treasury account, at the agreed-upon adjusted interest rate, and we believe and so conclude that the pesos should be valued as of that date without further discounts or reductions in value.

The restrictions on the Procesos' class B stock, particularly on redemption of the stock and the restriction on the payment of guaranteed dividends, in light of the startup nature of Procesos and the nature of petitioner's investment in Mexico through Procesos, do not justify any reduction in the value of the pesos. The restriction on transfer of the stock was not significant. The stock could be transferred to any non-Mexican individual or company at any time, including a U.S.-based subsidiary of a Mexican corporation.

As a result of the transaction before us, petitioner, at a cost of US$634,000, generated an extra US$410,000 for use in Mexico in the construction of its lambskin processing plant. Petitioner is to be treated as having realized a taxable gain of US$410,000 on the exchange of the U.S. dollar-denominated Mexican Government debt for the Mex$1,736,694,000 (having a value of US$1,044,000).

For the reasons explained, we hold for respondent on the issue before us.

*Decision will be entered under Rule 155.*