106 T.C. No. 13


UNITED STATES TAX COURT


G.M. TRADING CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket No. 6983-91.                    Filed April 17, 1996.


  On reconsideration, we decline to alter
any of the findings of fact or conclusions of
law set forth in our prior opinion at 103
T.C. 59 (1994).  Supplemental findings of
fact and conclusions of law made.
  <u>Held</u>, we adhere to our prior holding
that petitioner is to be treated as having
realized a taxable gain on the exchange of
U.S. dollar-denominated Mexican Government
debt for Mexican pesos.  We also adhere to
our prior findings and conclusions regarding
the value of the pesos received and the
amount of gain realized.

  This opinion supplements our prior opinion, <u>G.M. Trading
Corp. v. Commissioner</u>, 103 T.C. 59 (1994).

R. James Curphy, for petitioner.**

T. Richard Sealy III, for respondent.

SUPPLEMENTAL OPINION

SWIFT, Judge:  This matter is before us on reconsideration of our opinion at 103 T.C. 59 (1994), in which we concluded that petitioner realized a taxable gain in connection with a "Mexican debt-equity-swap" transaction.  On October 13, 1994, we granted petitioner's motion for reconsideration, and we requested that petitioner and respondent file briefs on the points raised in petitioner's motion for reconsideration.  We also allowed amici briefs to be filed by Chrysler Corp. and by Harold L. Adrion.

On reconsideration, petitioners and the amici curiae make three primary arguments:  (1) That the value of the Mexican pesos that were received by petitioner (or by Procesos, petitioner's Mexican subsidiary corporation) did not exceed petitioner's U.S. dollar cost of participating in the transaction and that petitioner, therefore, realized no gain on the transaction; (2) that the transaction should not be viewed as a taxable exchange because petitioner could not legally own an interest in the U.S. dollar-denominated debt of the Mexican Government; and (3) that if gain was realized over petitioner's cost of participating in the transaction, such gain should be regarded,

---

Briefs amici curiae were filed by James P. Fuller, Kenneth B. Clark, and Jennifer L. Fuller, as attorneys for Chrysler Corp., and by Harold L. Adrion.

under section 118, as a nontaxable capital contribution by the Mexican Government to petitioner or to Procesos.

We have considered the arguments and voluminous material submitted by petitioner, by the amici curiae, and by respondent. We, however, remain convinced as to the correctness of our prior findings and opinion. Accordingly, we decline to alter any of the findings of fact or conclusions of law set forth in our prior opinion.

Our prior opinion explained the general nature of the Mexican debt-equity-swap transaction that is at issue in this case, and we will not repeat that explanation. We, however, do make herein a number of supplemental findings of fact and conclusions of law, and we provide additional explanation for our opinion, as set forth below.

For convenience, we combine our supplemental findings of fact and conclusions of law.

All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Value of Mexican Pesos

It is argued by petitioner and by the amici curiae that the fair market value of the Mexican pesos that petitioner or Procesos, as petitioner's designee, received to construct and to operate a lambskin processing plant in Mexico should be presumed to be equal to or measured by petitioner's US$634,000 cost of participating in the transaction. We disagree. We continue to

believe that the fair market value of the Mexican pesos should be governed by the fair market US$/Mex$ exchange rate that existed on November 5, 1987.

In order to participate in this transaction and to receive Mex$1,736,694,000 to invest in Mexico, petitioner incurred not only a hard currency cost of US$634,000, but petitioner also --

> (1) agreed to transfer to the Mexican Government for cancellation the US$1,200,000-denominated debt that petitioner purchased from the NMB Nederlandsche Middenstandsbank N.V. Bank (NMB Bank);

> (2) agreed to invest in Mexico all of the Mexican pesos that were received; and

> (3) agreed to provide jobs for Mexican nationals at the lambskin processing plant to be constructed in Mexico.

Even though these three additional elements did not have an immediate hard currency cost to petitioner and did not increase petitioner's tax basis or tax cost in the transaction, such additional elements provided by petitioner to the Mexican Government represented valuable and material aspects of the transaction and should not be ignored if we are to properly value the currency consideration received by petitioner (namely, the Mex$1,736,694,000). Petitioner's argument (and that of the amici curiae) that the Mexican pesos are presumed equal to petitioner's US$634,000 currency cost of participating in this transaction ignores the value of these significant additional elements provided by petitioner.

Petitioner's purchase of the US$1,200,000 Mexican Government debt and petitioner's transfer of this debt to the Mexican

Government for cancellation, without the Mexican Government spending any U.S. dollars, constituted a primary purpose of this transaction. If the financial interests of the Mexican Government would have been just as well-served (as the amici curiae apparently contend) by the Mexican Government itself purchasing for US$600,000 the US$1,200,000 Mexican Government debt and then canceling that debt, perhaps the transaction could have been so structured.

To the contrary, however, the transaction was structured so that the US$1,200,000 Mexican Government debt would be canceled without the Mexican Government using any of its limited supply of U.S. dollars and also without any of the Mexican pesos that were used in the transaction leaving Mexico. From the standpoint of both petitioner and the Mexican Government, these two features or benefits of the transaction, made possible by the additional elements provided by petitioner as described above, shape the form and substance of the transaction before us.

We therefore believe that it would be artificial to presume, as petitioner and the amici curiae would have us do, that the value of the Mex$1,736,694,000 (the currency consideration received by petitioner or by Procesos, as petitioner's designee, for participating in this transaction) equals petitioner's US$634,000 cost of purchasing the US$1,200,000 Mexican Government debt and transferring the debt to the Mexican Government. This argument ignores that in reality the Mexican Government acquired

from petitioner not only the surrender of the debt, but also the additional three elements identified above.

Respondent, in her brief, accurately describes petitioner's taxable gain from engaging in this transaction as follows:

In a traditional, private market transaction, for US$600,000 petitioner would have obtained no more than Mex$998,100,000 based on the free-market exchange peso/dollar exchange rate at the time [of] the Debt/Equity Swap * * * which would have allowed it to have acquired land and build a plant worth only US$600,000. Instead, using the Debt/Equity Swap, * * * [petitioner] obtained Mex$1,736,694,000 for the same amount of money, allowing it to build a plant worth US$1,044,000. The increase obtained as a result of the swap was Mex$738,594,000 (Mex$1,736,694,000 less Mex$998,100,000) which, on the date of the Debt/Equity Swap, was equal in value to US$444,000 (Mex$738,594,000 divided by 1,663.50 (pesos/dollar free-market exchange rate on date of swap)), which is precisely the amount of gain which respondent contends petitioner realized on the transaction (fair market value of Mex$1,736,694,000 received in exchange for the US$1,200,000 Face Amount Mexican Debt (US$1,044,000) less amount paid for the debt (US$600,000)), less US$34,000 of transaction costs.

More broadly, if the "restricted pesos" which petitioner obtained were worth no more than the US$600,000 which * * * [petitioner] paid for the debt, why then did * * * [petitioner] even go to the trouble of participating in the Debt/Equity Swap? Completing the swap involved a good deal of time and expense for petitioner--a detailed application had to be submitted, negotiations with relevant Mexican Government agencies had to be conducted, and approvals had to be obtained. If what was received as a result of the swap was no more valuable than what could have been obtained outside of it, why was it done? The answer is obvious --petitioner went to the trouble of participating in the swap because of the <u>added value</u> which it obtained through so doing. * * * This added value * * * [constitutes] a realized gain for federal income tax purposes, and no provision of the internal revenue laws exempts it from recognition. [Emphasis added.]

Respondent's above explanation is consistent with the following summary of the "basics" of debt-equity-swap transactions, viewed from the U.S. taxpayer's perspective, as set forth in an attachment to the brief of Chrysler, as amicus curiae:

> At its simplest, a debt-equity swap (also known as a debt conversion) involves the purchase by a firm, usually foreign, of sovereign debt at a discount in the secondary market from the bank holding it. The issuing country then buys back the debt in local currency at close to its face value. The firm spends the local currency received in an approved manner within the country, usually to finance a fixed equity investment. Since the prepayment of the obligation is made at a substantial discount and the local funds are obtained at a much smaller discount, firms can realize a significant gain on the spread. [Business International Corp., Debt-Equity Swaps: How To Tap an Emerging Market (1987). Emphasis added.]

With regard to the value of the Mex$1,736,694,000 that was received, petitioner and the amici curiae argue strenuously that the Court in our prior opinion improperly considered subjective factors to minimize the effect of certain restrictions on the use of the Mexican pesos and that such subjective factors are not properly considered in the hypothetical, willing buyer/willing seller scenario that typically governs a determination of fair market value. We disagree.

The fact that petitioner and Procesos entered into the transaction for the very purpose of obtaining Mexican pesos to construct and to operate a lambskin processing plant in Mexico is an undisputed fact of this transaction. There is nothing subjective about this fact other than that it relates generally

to the undisputed intent of representatives of petitioner and of Procesos.  This fact and the requirements relating to the use of the pesos reflect the transaction negotiated and bargained for by the parties -- by petitioner, by Procesos, and by the Mexican Government.

In the present case, where petitioner negotiated for a principal amount of a recognized currency in order to invest that currency in a specific project, we do not believe that the terms, requirements, and limitations set forth in the final negotiated agreement regarding use of the currency (which simply reflect and conform to the original and continuing purpose and objective of the transaction -- namely, to invest the currency in a specific project) should be regarded as restricting or discounting the fair market value of the currency that is then made available under the agreement.

The restrictions relating to petitioner's and to Procesos' access and use of the Mexican pesos and to certain class B stock in Procesos were consistent with the overall purpose and objective of each party to the transaction.  They were consistent with the business objectives of each party.  In our judgment, as we stated in our prior opinion, they were not significantly different from restrictions commonly placed by financial institutions on loan proceeds and on startup companies in disbursing loan proceeds relating to construction loans or project financing.

Petitioner and the amici curiae cite numerous cases in support of their argument that a fair market valuation of property generally should not take into account subjective factors (such as the intended use of the property).  Properly read, however, the cases cited do not stand for the proposition that all subjective elements in a transaction (such as the intent of the parties and the purpose for the transaction) should be disregarded in determining fair market value.  Rather, the cases cited stand for the limited proposition that blatantly self-serving, subjective testimony and evidence offered in an attempt, after the fact, to revalue a transaction contrary to its recognized market value will be rejected.

In Rooney v. Commissioner, 88 T.C. 523, 527 (1987), because of alleged subjective "circumstances [that] compelled * * * [the taxpayers] to accept * * * goods and services at prices higher than they would otherwise pay", the taxpayers attempted to value the goods and services at less than the recognized market value therefor.  The Court in Rooney rejected this argument, stating that "petitioners may not adjust the acknowledged retail price of the goods and services received merely because they decide among themselves that such goods and services were overpriced".  Id. at 528; accord Baker v. Commissioner, 88 T.C. 1282, 1289 (1987).

The taxpayer's argument in Koons v. United States, 315 F.2d 542 (9th Cir. 1963), perhaps best reflects petitioner's argument in this regard.  In Koons, an employer paid moving expenses of the taxpayer.  The taxpayer conceded that the value of the moving services was includable in his gross income but attempted to

value the services at less than the employer's cost.  The
taxpayer speculated that he personally could have paid less to
move himself than his employer had paid, that the services
received were therefore worth less to him, and that he should not
have to report the services at their recognized value.  The court
rejected this argument because the taxpayer "had no obligation to
accept these [moving] services, * * * [he] did accept them, this
being a part of the bargain with * * * [his employer], and * * *
the services were in fact rendered and were paid for [by his
employer] at the fair market value."  Id. at 545.

A superficial reading of Landau v. Commissioner, 7 T.C. 12
(1946), may appear to support petitioner's position.  Therein,
however, South African pounds[1] received as a gift were subject to
preexisting limitations on their removal from South Africa.  The
taxpayer had no control over these restrictions.  The
restrictions were not the product of negotiations and bargaining
by the parties, and the Court found that the fair market value of
the South African pounds received as a gift should be discounted
to reflect the preexisting restrictions.

The present case is somewhat analogous to cases involving
the valuation of stock includable in a gross estate where the
stock, on the date of decedent's death, is subject to a
restrictive stock purchase agreement at a specified price.
Typically, in such cases, the taxpayers argue (in light of the
preexisting restrictions that are applicable to the stock) for a

---

South African currency is now measured in rands.

valuation <u>consistent</u> with the price specified in the stock purchase agreement.  See, e.g., <u>Estate of Gloeckner v. Commissioner</u>, T.C. Memo. 1996-148; <u>Estate of Lauder v. Commissioner</u>, T.C. Memo. 1992-736.

In the instant case, in effect, petitioner (taking into account the so-called "restrictions" and other characteristics of the Mexican pesos to be received) and the Mexican Government (taking into account its U.S. dollar-denominated debt to be canceled and the perceived economic benefit to be received in Mexico from construction of a new plant) negotiated for and agreed to the transfer and receipt of a specified amount of Mexican pesos (i.e., they agreed to a stated price in the form of a recognized monetary currency).  But petitioner and the amici curiae (contrary to the typical case involving restrictive stock purchase agreements where the taxpayer is seeking to adhere to the price specified in the agreement) now seek to disavow the stated Mexican peso price that was agreed to and that is specified in the agreement (namely, Mex$1,736,694,000).

With regard to the transaction before us, it is noteworthy that during the year at issue broad Mexican Government restrictions applied generally to investments by U.S. companies in Mexico.[2]  Properly viewed, the debt-equity-swap transaction before us, and the so-called "restrictions" placed on the pesos received, may be regarded as the opening up of a business

---

See 1973 Law to Promote Mexican Investment and Regulate Foreign Investment, as explained in Business International Corp., Debt-Equity Swaps: How to Tap an Emerging Market, 54-55 (1987), which foreign law we take notice of under Rule 146.

opportunity for petitioner in Mexico (i.e., as a reduction in or elimination of restrictions that otherwise would have prohibited petitioner's investment in Mexico). Viewed in this light, the 1,736,694,000 bargained-for Mexican pesos received in this transaction may be regarded, in some respects, as more valuable to petitioner than pesos that petitioner could have obtained on the open market because there were attached to these pesos special, pre-approved business opportunities for petitioner in Mexico and because the pesos carried with them an interest rate that protected petitioner from risks associated with inflation in Mexico and with fluctuations in the US$/Mex$ exchange rate. The so-called "restrictions" attached to the pesos involved in this transaction, therefore, in this respect served as enhancements to the value of the pesos.

Ownership of US$1,200,000 Mexican Government Debt

Petitioner and the amici curiae argue that only banks could legally own the US$1,200,000 Mexican Government debt and that petitioner, therefore, should not be treated as having acquired the debt and as having transferred the debt to petitioner. Petitioner and the amici curiae also argue that if petitioner is to be regarded as having acquired the debt, petitioner's interest therein should be treated as so fleeting and momentary that it should be disregarded.

Respondent acknowledges provisions of the Restructure Agreement that place some limitations on assignment of Mexican Government debt, but respondent notes that none of these

provisions applies to a transfer or assignment of the debt, nor to the transfer or assignment of a participation therein, by a bank domiciled in the United States. Respondent also notes that under New York case law any prohibition on assignment must be express.

The vague limitations on transferability of Mexican Government debt on which petitioner relies are largely meaningless in this case. Under the Debt Participation and Capitalization Agreement and the Restructure Agreement, the Mexican Government expressly consented to the transfer of its US$1,200,000 debt, or of a "participation" therein, to petitioner. The Mexican Government thereby is to be regarded as having waived whatever restrictions generally would have applied to such a transfer of Mexican Government debt to petitioner.

Arguments as to petitioner's alleged lack of an ownership interest in the debt are clearly erroneous and are rejected.

Similarly, the argument must be rejected that any ownership interest or participation of petitioner in the debt occurred for such a momentary period of time that such interest or participation should be disregarded. It was petitioner's provision of the US$600,000 that caused the NMB Bank to relinquish the US$1,200,000 Mexican Government debt -- hardly an economic fact that we can ignore.

It does appear that another New York-based bank did act as a mere agent in the debt-equity-swap transaction before us. That bank's mere agency role has been ignored for purposes of the

substance of the transaction.  Petitioner's substantial economic role in the transaction, however, will not be disregarded.

Capital Contribution of Alleged Excess Value

Petitioner and the amici curiae argue that any value petitioner may have realized over its US$634,000 hard dollar cost of participating in the transaction (referred to by petitioner as "excess value") should be treated, under section 118, as a nontaxable capital contribution by the Mexican Government to petitioner or to Procesos.

Petitioner's argument oversimplifies and neglects important facts relating to the nature of this transaction and to the consideration paid and received by petitioner, on the one hand, and by the Mexican Government, on the other.

Petitioner did not transfer US$600,000 to the Mexican Government.  Rather, petitioner provided those U.S. dollars to a commercial bank in exchange for U.S. dollar-denominated debt of the Mexican Government with a face amount of US$1,200,000. Petitioner then exchanged not the US$600,000 in cash but the US$1,200,000 Mexican Government debt for Mex$1,736,694,000.  As a further, significant element of the transaction, petitioner was also given Mexican governmental permission to construct a lambskin processing plant in Mexico, and petitioner was provided pesos at a very favorable exchange rate.  The Mexican Government was relieved of its US$1,200,000 debt without using its limited supply of U.S. dollars, and it obtained a commitment that the Mexican pesos it provided would stay in Mexico.

On these facts, it is clear that the Mexican Government, as a result of and in return for its participation in this transaction and for the "excess value" it provided, received direct, specific, and significant economic benefits that related primarily to its perilous foreign exchange position.

As we said in Federated Dept. Stores v. Commissioner, 51 T.C. 500, 519 (1968), affd. 426 F.2d 417 (6th Cir. 1970), tax-free capital contribution treatment under section 118 is available where the "only benefit" anticipated and received by the governmental entity making the "contribution" constitutes an indirect civic benefit such as anticipated increased business. In Brown Shoe Co. v. Commissioner, 339 U.S. 583 (1950), contributions or payments by a governmental entity to assist a taxpayer in financing construction of a factory were not made in exchange for, nor accompanied by, extinguishment of the governmental entity's million dollar debt obligation.

Perhaps, if the Mexican Government merely had transferred the Mexican pesos to Procesos in exchange for petitioner's commitment to use the pesos to construct a plant in Mexico, receipt of the pesos would qualify under section 118 as a tax-free contribution of capital. The Mexican Government, however, in the transaction before us, did not provide the pesos merely in exchange for a commitment to construct a plant in Mexico. It also received cancellation of its US$1,200,000 debt obligation without using any U.S. dollars, and the pesos that it provided remained in Mexico. The surrender of the debt constitutes a

quid pro quo that taints what otherwise may have qualified under section 118 as a tax-free contribution of capital.

Petitioner and the amici curiae argue that the Court misapplies the step transaction doctrine. Petitioner cites J.E. Seagram Corp. v. Commissioner, 104 T.C. 75 (1995). To the contrary, we believe we have followed the reasoning of that case by taking into account the "overall" transaction at issue. Id. at 94.

As we understand it, the overriding function of the step transaction doctrine is to combine individually meaningless or unnecessary steps into a single transaction. See Tandy Corp. v. Commissioner, 92 T.C. 1165, 1172 (1989); Esmark, Inc. v. Commissioner, 90 T.C. 171, 195 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989).

However, a step in a series of transactions or in an overall transaction that has a discrete business purpose, a discrete economic significance, and that appropriately triggers an incident of Federal taxation, is not to be disregarded. Further, the simultaneous nature of a number of steps does not require all but the first and the last (or "the start and finish") to be ignored for Federal income tax purposes. Tandy Corp. v. Commissioner, supra at 1172 ("step transaction doctrine is not appropriate in every transaction that takes place in one or more steps"); Rev. Rul. 79-250, 1979-2 C.B. 156, 157 ("the substance of each of a series of steps will be recognized * * * if each such step demonstrates independent economic significance, is not subject to attack as a sham, and was undertaken for valid

business purposes"); 11 Mertens, Law of Federal Income Taxation, secs. 43.254-43.255 (1990 rev.). Under the facts of this case, the step transaction doctrine does not require the Court to disregard the gain realized by petitioner upon receipt of the pesos.

Petitioner and the amici curiae make a number of additional arguments. We find them to be without merit. Also, the amici curiae seek to raise a number of new issues not raised in the petition in this case. We decline to address issues not raised in the pleadings and not properly before us.

For the reasons stated, we decline to alter the result reached in our opinion reported at 103 T.C. 59.

<u>Decision will be entered</u>

<u>under Rule 155</u>.