J.E. SEAGRAM CORP., F.K.A. SEAGOLD VINEYARDS HOLDING CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6112–92.          Filed January 24, 1995.

---

[6] If we are in error as to the lack of necessity to deal with these arguments, they can be dealt with under Rule 155.

*Harold R. Handler* and *David W. Ichel,* for petitioner.

*Anne Hintermeister* and *William H. Stoddard,* for respondent.

OPINION

NIMS, *Judge:* Respondent determined a deficiency in Federal income tax with respect to petitioner's fiscal year ended July 31, 1982, in the amount of $160,127,325. Respondent also determined deficiencies for withholding of income tax at source in the following amounts:

| Calendar year | Withholding deficiency |
|---|---|
| 1982 | $175,696 |
| 1983 | 172,914 |
| 1984 | 64,886 |

In addition to contesting these deficiencies, petitioner claims overpayments in Federal income tax with respect to its fiscal year ended July 31, 1982, in the amount of $1,954,608.

Following concessions by the parties, the only issue for decision is whether petitioner is entitled to a short-term capital loss in the amount of $530,410,896. All issues relating to petitioner's withholding liabilities for the calendar years 1982, 1983, and 1984, have been resolved by the parties.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

The parties agree that the material facts are not in dispute. Each of the parties has filed a motion for summary judgment, along with supporting affidavits, pursuant to Rule 121. The parties have also filed three stipulations of fact. Summary adjudication is appropriate. Rule 121.

The stipulation of facts and the attached exhibits are incorporated herein by this reference.

## Background

Petitioner is a Delaware corporation with its principal place of business at 800 Third Avenue, New York, New York, at the time the petition was filed in this case. Petitioner is the common parent of an affiliated group of corporations. It is an accrual basis taxpayer that keeps its books and records, and files its Federal income tax returns, on the basis of a fiscal year ending July 31.

Prior to the incorporation of petitioner on July 2, 1981, Joseph E. Seagram & Sons, Inc. (JES), an Indiana corporation, was the U.S. parent of an affiliated group of corporations. JES was an indirect wholly owned subsidiary of the Seagram Co. Ltd. (SCL), a Canada corporation. SCL was principally engaged in the production and marketing of distilled spirits and wine. On July 30, 1981, all of the stock of JES was transferred to petitioner in exchange for its stock. On August 23, 1990, petitioner's name was changed to J.E. Seagram Corp. Prior to that date, its name had been Seagold Vineyards Holding Corp.

## The Dome Tender Offer

On May 6, 1981, Dome Petroleum Ltd. (Dome) commenced a tender offer for approximately 20 percent of the common stock of Conoco, Inc. (Conoco), a Delaware corporation engaged in the oil and gas industry as an "integrated oil company". At all relevant times, Conoco's stock was traded on the New York Stock Exchange (NYSE). On May 27, 1981, Dome announced that approximately 50 percent of the common stock of Conoco had been tendered pursuant to its offer. On June 1, 1981, Conoco and Dome agreed that Conoco would trade the stock of one of its subsidiaries, Hudson's Bay Oil & Gas Co. Ltd., for Dome's Conoco stock plus $245 million. This trade was effected on June 10, 1981.

SCL, which is unrelated to Dome, had no prior knowledge of the Dome tender offer and played no role in the June 1981 Dome/Conoco transaction. Because of the response of Conoco's shareholders to the Dome tender offer, however, SCL believed that it might be able to negotiate to obtain a significant investment in Conoco.

*JES / Conoco Discussions*

Between May 29 and June 17, 1981, SCL conducted extensive negotiations with Conoco concerning proposals for it to acquire directly from Conoco, and/or through open-market purchases, between 18 percent and 35 percent of the common stock of Conoco. On May 29, 1981, Edgar M. Bronfman, chairman and chief executive officer of SCL, arranged a meeting with Conoco officials. On May 30, 1981, Bronfman proposed that SCL acquire 35 percent of the stock of Conoco and enter into a "standstill" agreement with respect to this investment. On May 31, 1981, Ralph E. Bailey, chairman and chief executive officer of Conoco, stated that he preferred a 25-percent SCL investment in Conoco. Bronfman thereafter made a presentation to the Conoco board of directors.

From June 1 to June 15, 1981, representatives of SCL and Conoco, and their respective advisers, met and negotiated concerning an agreement. On June 14, 1981, SCL delivered a draft agreement whereby it or a subsidiary would acquire at least 18 percent of the Conoco shares and would agree not to acquire more than a total of 25 percent of such shares for a 15-year period, subject to certain conditions. On June 15, 1981, Bronfman offered to acquire 25 percent of Conoco's shares in direct purchases from Conoco for $70 per share. Alternatively, Bronfman proposed that SCL purchase a portion of its investment in Conoco through open-market purchases. On June 17, 1981, Bailey informed Bronfman that the Conoco board of directors had rejected the proposal for a significant investment in Conoco by SCL or its subsidiaries, claiming that it would not be in the long-term interests of Conoco.

*The JES Tender Offer*

On June 18 and 19, 1981, JES purchased 143,800 shares of Conoco in open market purchases on the NYSE. On June 25, 1981, JES Holdings, Inc. (JES Tenderor), a wholly owned subsidiary of JES, initiated a tender offer for the purchase of up to 35 million shares (40.76 percent of the 85,864,538 shares outstanding on such date) of Conoco for $73 per share (the JES tender offer). The last date for the withdrawal of tendered shares was July 17, 1981, and the offer was set to expire on July 24, 1981.

The JES tender offer was conditioned on a minimum of 28 million shares (33 percent) of Conoco common stock being tendered and not withdrawn. JES Tenderor also maintained the right to terminate the offer for Conoco if a competing tender offer was commenced or under other conditions specified in its offer. The offering prospectus stated, in part, that

The purpose of the Offer is to enable * * * [JES Tenderor] to exercise significant influence over * * * [Conoco's] operating and financial policies. If 35,000,000 Shares are purchased pursuant to the Offer, * * * [JES Tenderor] expects to be the largest single stockholder of * * * [Conoco] and may be deemed to be in control of * * * [Conoco]. * * *

On June 30, 1981, the Conoco board of directors recommended that Conoco shareholders reject the JES tender offer on the ground that it was not "in the best interests of [Conoco] and its subsidiaries."

## The DuPont / Conoco Agreement

On June 24, 1981, Edward G. Jefferson, chairman and chief executive officer of E.I. DuPont de Nemours & Co. (DuPont), called Bailey to determine whether there was any constructive role DuPont might play in light of public reports. DuPont is principally engaged in manufacturing and selling diversified lines of chemicals, plastics, specialty products, and fibers. DuPont's stock is traded on the NYSE. On June 25, 1981, Bailey contacted Jefferson to determine if DuPont would be interested in the possibility of a merger with Conoco. Beginning on June 28, 1981, Conoco and DuPont representatives discussed a possible merger.

On July 6, 1981, DuPont Holdings, Inc. (DuPont Tenderor), a wholly owned subsidiary of DuPont, signed an agreement with Conoco (the DuPont/Conoco agreement or, alternatively, the agreement). The DuPont/Conoco agreement provided that DuPont Tenderor would offer (the DuPont tender offer) to exchange for each share of Conoco common stock at least either (i) 1.6 shares of DuPont common stock, or (ii) $87.50 in cash. The agreement also provided that "As promptly as practicable following the consummation or termination of the Offer, * * * [Conoco] shall be merged into * * * [DuPont Tenderor] in accordance with the Delaware General Corporation Law" (the merger), and DuPont Tenderor would thereby acquire any Conoco shares not acquired in the tender offer.

The obligation of DuPont Tenderor to accept shares for exchange was subject to the following conditions, among others: (i) At least 43,500,000 shares (51 percent of the 85,991,896 Conoco shares outstanding on such date) were tendered; (ii) no more than 34,400,000 shares (40 percent) of Conoco would be exchanged for cash; (iii) a majority of DuPont shareholders approved the acquisition of Conoco and authorized an increase in the number of DuPont shares; (iv) the transaction was approved by Federal antitrust agencies; and (v) there would be no action taken or statute, rule, regulation, or order proposed or enacted by any Federal or State governmental authority which would make the acquisition or merger illegal. The obligation of DuPont Tenderor to accept shares for exchange was not conditioned upon the consummation of the merger. The consummation of the merger was subject to, among other conditions, DuPont shareholder approval, Federal antitrust review, the absence of an injunction prohibiting the merger, and the condition that a majority of Conoco common shareholders approve the merger if required under the Delaware General Corporation Law.

The DuPont/Conoco agreement also granted DuPont Tenderor an option (the option) to purchase up to 15,900,000 authorized but unissued shares of Conoco for $87.50 per share which could be paid in whole or in part in cash or a note of DuPont Tenderor guaranteed by DuPont. Prior to July 6, 1981, DuPont Tenderor beneficially owned fewer than 11,000 shares of Conoco (without regard to the option).

On July 6, 1981, DuPont issued a press release which stated, in part, that

> The DuPont Company and Conoco, Inc. have entered into a definitive agreement for DuPont to acquire 100 percent of Conoco's stock for DuPont common stock and cash, to be followed by a merger of the two companies, * * *

On July 8, 1981, DuPont filed a premerger notification with the Federal Trade Commission and the Antitrust Division of the Department of Justice.

On July 30, 1981, the Department of Justice completed its review of the proposed DuPont-Conoco merger and indicated that the Hart-Scott-Rodino waiting period would end upon the filing of a consent decree requiring DuPont Tenderor's

disposition of Conoco's interest, or its purchase of Monsanto's interest, in a Conoco/Monsanto joint venture.

## The Mobil Tender Offer

On July 17, 1981, Mobil Corp. (Mobil) initiated a tender offer for the purchase of up to 43,500,000 shares (51 percent) of Conoco for $90 per share (the Mobil tender offer). Mobil stated that the offer would be followed by a merger of Conoco into a wholly owned subsidiary of Mobil. Upon the merger, Mobil would exchange securities having a value substantially equal to $90 per share for the Conoco common shares not tendered to Mobil. The last date for the withdrawal of tendered shares was August 6, 1981, and the offer was set to expire on August 13, 1981. Mobil's obligation to purchase was conditioned on its receiving tenders for a minimum of 43,500,000 common shares of Conoco.

## The Tender Offer Competition

On July 12, 1981, JES Tenderor increased its tender offer to include the purchase of up to 44,350,000 Conoco shares (slightly over 51 percent of the outstanding Conoco shares not already owned by JES) and increased its offering price from $73 to $85 in cash per Conoco common share. JES also announced that its revised offer was no longer conditioned upon the tender of a minimum number of shares. The offering prospectus specifically discussed the DuPont/Conoco agreement and stated that

The purpose of the [JES tender] Offer is to acquire a majority of the issued and outstanding Shares and thereby control * * * [Conoco]. If 44,350,000 Shares are purchased * * * [JES Tenderor] would have the power under Delaware law to elect all of * * * [Conoco's] directors and to prevent the consummation of the proposed DuPont merger. * * * [JES Tenderor] currently intends to vote any Shares it may acquire against the proposed DuPont merger.

JES also waived its right to terminate the JES tender offer as a result of the DuPont/Conoco agreement, as publicly described as of July 10, 1981.

On July 14, 1981, DuPont Tenderor announced an increase in the cash price of its tender offer from $87.50 to $95 per Conoco common share and in the number of shares of DuPont common stock offered from 1.6 to 1.7 shares per Con-

oco share. The last date for the withdrawal of tendered shares was August 4, 1981, and the offer was to expire on August 17, 1981.

In an opinion issued by DuPont's tax counsel on July 14, 1981, it is stated that counsel were advised that

1. The Conoco liabilities to be assumed by * * * [DuPont Tenderor] have been incurred in the ordinary course of Conoco's business, or are associated with the Conoco assets to be acquired.

2. * * * [DuPont Tenderor] is acquiring Conoco for the purpose of continuing Conoco's present business.

3. * * * [DuPont Tenderor] has no plan or intention to dispose of any of Conoco's assets that it will receive pursuant to the Merger, except in the ordinary course of business.

4. DuPont has no plan or intention to transfer ownership or otherwise dispose of any shares of common stock of * * * [DuPont Tenderor], or to liquidate * * * [DuPont].

5. The managements of DuPont and Conoco are not aware of any concerted plan or intention on the part of Conoco stockholders to sell or otherwise dispose of any of the DuPont shares to be received in the Offer and Merger.

6. There exists, and prior to the Merger there will be incurred, no intercorporate indebtedness between * * * [DuPont Tenderor] and Conoco, except as a result of the purchase by * * * [DuPont Tenderor] of Conoco Shares from Conoco pursuant to the Agreement.

7. No Conoco Shares are held by any Conoco subsidiary, and * * * [DuPont Tenderor] and DuPont do not, and will not, own any Conoco shares other than shares acquired pursuant to the Offer or Conoco Shares acquired from Conoco pursuant to the Agreement.

8. Conoco's redemption of its previously outstanding class of preferred stock on June 30, 1981 was unrelated to DuPont's acquisition of Conoco.

## As a basis for the tax opinion counsel also assumed that

1. Not more than 51 percent of the presently outstanding Conoco Shares (not including Conoco Shares for which cash is received in lieu of fractional DuPont Shares, but including Conoco Shares held by dissenting stockholders, if any, in the Merger) will be exchanged for cash pursuant to the Offer and the Merger.

2. Less than 10 percent of the presently outstanding Conoco Shares will be held by dissenting stockholders in the Merger, if dissenters' rights are available in the Merger. Moreover, * * * [DuPont Tenderor] will acquire in the Merger at least 90 percent of the fair market value of the net assets of Conoco and at least 70 percent of the fair market value of the gross assets of Conoco, after taking into account amounts paid to dissenting stockholders, if any, and expenses incurred by Conoco pursuant to the Offer and the Merger.

3. There have been and will be no redemptions of Conoco Shares in contemplation of the Merger.

4. If dividends are paid by Conoco prior to the Merger, such dividends will be consistent in amount and effect with prior dividend distributions.

5. The market price of DuPont Shares will not be below $39 per share during the period beginning with the Offer and ending with the effective date of the Merger.

## Tax counsel concluded that

It is our opinion that the Offer and the Merger should, if the Merger is consummated, be treated by the Internal Revenue Service or the courts as a single integrated transaction (with exchanges pursuant to the Offer treated as part of the Merger transaction) and that, accordingly, exchanges of Conoco Shares for DuPont Shares and cash pursuant to the Offer and the Merger should be treated for federal income tax purposes as exchanges pursuant to a plan of "reorganization" within the meaning of Section 368(a)(1)(A) and (a)(2)(D) of the Code. * * *

The DuPont tender offer commenced on July 15, 1981, when DuPont's registration statement was declared effective by the Securities and Exchange Commission (SEC). Under the heading "Purpose of the Offer; the Option; Plans for Merger and Control of Conoco", the offering prospectus stated, in part, that

The purpose of the Offer and the Merger is to acquire the entire equity interest in Conoco. The Offer is being made pursuant to the Agreement which provides that following consummation of the Offer Conoco will be merged into * * * [DuPont Tenderor].* * * The Merger requires the approval of a majority of the outstanding Conoco Shares. * * * If, as a result of the Offer and the acquisition of Conoco Shares pursuant to the Option, * * * [DuPont Tenderor] is the holder of a majority of the Conoco Shares, the Merger could be adopted regardless of the votes of any other Conoco stockholders * * *

On July 15, 1981, Conoco issued a letter to Conoco stockholders which stated, in part, that

Your Board of Directors has unanimously approved a business combination of E.I. DuPont de Nemours and Company and Conoco Inc. in a two step transaction.

Conoco has entered into an Agreement with DuPont, dated as of July 5, 1981, which provides that DuPont, through a wholly owned subsidiary, will make a tender offer to acquire all outstanding shares of Conoco common stock by exchanging either cash or shares of DuPont common stock, or a combination of both * * * As soon as practicable after the completion of the tender offer, Conoco will be merged into the DuPont subsidiary. * * *

* * * * * * *

*Your Board of Directors has unanimously approved the DuPont offer and recommends acceptance of the offer by all Conoco stockholders.*

On July 23, 1981, JES Tenderor increased its tender offer price from $85 to $92 in cash per Conoco common share. The withdrawal date of the offer was extended to July 31, 1981, and the expiration date was extended to August 5, 1981. This offer was not conditioned upon the tender of a minimum number of shares. The offering prospectus referred to both the DuPont and Mobil tender offers and waived the right of JES Tenderor to terminate its tender offer as a result of such competing tender offers, as publicly described as of July 21, 1981.

On July 27, 1981, Mobil increased its tender offer from $90 to $105 in cash per Conoco common share, and DuPont announced an increase in the cash portion of its tender offer from 40 percent of the outstanding Conoco shares to 45 percent of said shares (which was approved by the DuPont board of directors on July 29, 1981).

Also on July 27, 1981, DuPont announced that a preliminary count indicated that as of midnight July 24, 1981, approximately 35 million shares of Conoco stock had been tendered to DuPont. The announcement noted that these shares, combined with the 15,900,000 shares to be acquired upon exercise of the option, would give DuPont approximately 50 percent of the Conoco shares outstanding after the exercise of the option.

A press release issued by JES on July 27, 1981, stated that a preliminary count indicated that, as of midnight on July 26, approximately 17 million Conoco shares had been tendered to JES. This release also stated that

[JES] has waived its rights and will not terminate its offer even if: a) DuPont and/or Mobil were to increase their offering price; b) DuPont or Mobil were to waive their condition that a minimum number of shares must be tendered to them; c) DuPont were to waive its condition that a shareholder vote, scheduled for August 17, is required before DuPont will purchase any shares; or d) DuPont were to exercise its rights to buy up to 50 percent of Conoco's shares for cash.

On July 28, 1981, DuPont announced that its continuing preliminary count indicated that as of the close of business on July 27, 1981, at least 38,700,000 Conoco shares had been tendered pursuant to the DuPont tender offer. On July 29,

1981, DuPont announced that its preliminary count indicated that as of the close of business on July 28, more than 48 million Conoco shares (56 percent of those outstanding) had been tendered pursuant to the DuPont tender offer. This announcement noted that tendered shares were subject to withdrawal until midnight August 4, 1981.

Also on July 29, JES issued a press release which stated, in part, that

[JES] charged this morning that any decision by DuPont's Board of Directors to increase the cash portion of the DuPont offer for Conoco common stock is likely to destroy any possibility of an Internal Revenue Service Ruling that the stock portion of the offer is not fully taxable.

*   *   *   *   *   *   *

* * * [JES] emphasized that the risk of full taxability is especially relevant in light of DuPont's announcement this morning that the cash portion of its offer is fully subscribed. Because of this oversubscription, shareholders who have not yet tendered their shares will receive only DuPont stock if they tender to DuPont, while shareholders who have already tendered may receive DuPont stock even though they elected to receive cash.

* * * [JES] further noted that shareholders who prefer to receive $92 in cash rather than DuPont stock with a value of $77.78 (based on last night's close) for their Conoco shares continue to have the opportunity to do so by tendering to [JES]. Any tenders previously made to DuPont or Mobil are not irrevocable and may still be withdrawn.

On August 1, 1981, at 1 p.m., the withdrawal rights with respect to shares tendered to JES expired. Immediately thereafter, JES Tenderor began buying tendered Conoco shares. As of midnight on August 1, 1981, JES Tenderor had received tenders of more than 15,500,000 Conoco shares.

On August 3, 1981, Mobil increased its tender offer from $105 to $115 in cash per Conoco common share. On the same day, DuPont Tenderor announced a reduction from 51 percent to 41 percent in the minimum percentage of outstanding shares of Conoco common stock required to be tendered by Conoco shareholders in order to be accepted for payment.

On August 4, 1981, DuPont Tenderor announced that the Justice Department had terminated the Hart-Scott-Rodino waiting period. On the same day, DuPont Tenderor increased the cash price of its tender offer from $95 to $98 per Conoco share.

Mobil also announced on August 4, 1981, that it was raising its tender offer consideration to $120 in cash per Conoco share.

On August 5, 1981, JES Tenderor extended the expiration date of its tender offer, which was scheduled to expire on August 5, to August 7, 1981.

*Litigation Between the Competitors*

On June 30, 1981, Conoco commenced a lawsuit in the U.S. District Court for the Southern District of New York against SCL, JES, and JES Tenderor, to (1) enjoin them from purchasing any Conoco shares, (2) impose restrictions on any Conoco shares purchased pursuant to the JES tender offer, and (3) recover money damages. In response, JES filed a counterclaim seeking to enjoin Conoco from selling or otherwise disposing of Conoco shares or assets. JES' motion for a temporary restraining order against Conoco was denied on July 3, 1981. On July 16, 1981, Conoco's request for a preliminary injunction against the continuance of the JES tender offer was denied. Conoco promptly appealed this ruling to the U.S. Court of Appeals for the Second Circuit. The District Court's denial of the preliminary injunction was affirmed on July 27, 1981.

On June 25, 1981, JES commenced a lawsuit in the U.S. District Court for the District of Delaware seeking, among other things, a declaration of the invalidity of a bylaw amendment adopted by Conoco's board of directors that purported to impose restrictions on foreign ownership of Conoco shares. On July 21, 1981, the District Court entered a decision, and issued a permanent injunction, largely in favor of JES. On July 22, 1981, Conoco appealed the District Court's decision to the U.S. Court of Appeals for the Third Circuit.

On July 30, 1981, Conoco obtained an ex parte temporary restraining order in a Florida State court against the JES tender offer. As of July 31, 1981, Conoco had also obtained a temporary restraining order from a North Carolina State court. Each of these temporary restraining orders was promptly dissolved. On July 31, 1981, the U.S. District Court for the Southern District of New York enjoined Conoco from making or publicizing other applications for temporary restraining orders without reasonable notice to JES.

On August 4, 1981, the U.S. District Court for the Southern District of New York denied Mobil's request for a temporary restraining order and a preliminary injunction to enjoin DuPont Tenderor from purchasing Conoco shares. Mobil moved for a stay pending appeal which stay was also denied on August 4, 1981.

Neither petitioner, JES, nor JES Tenderor sought to enjoin the granting of the option, DuPont Tenderor's exercise of the option, or DuPont Tenderor's purchase of Conoco shares.

## The Outcome

At midnight on August 4, 1981, the withdrawal period for shares tendered to DuPont Tenderor expired. On August 5, 1981, DuPont Tenderor began purchasing Conoco common shares tendered for cash. A press release issued on that day stated that

> The DuPont Company has been tendered a significant majority of the outstanding shares of Conoco Inc., and will move forward as rapidly as possible to effect a merger of the two companies.

Also on August 5, 1981, DuPont Tenderor exercised the option to purchase 15,900,000 Conoco shares directly from Conoco at a price of $87.50 per share. DuPont Tenderor paid $79,500,000 in cash and a 1-year note of DuPont in the principal amount of $1,311,750,000 for the Conoco shares purchased pursuant to the option.

In a press release dated August 6, 1981, JES noted that its tender offer had been extended through August 7, 1981, and that as of August 5, 1981, approximately 25,300,000 Conoco shares had been tendered. The press release then stated that

> * * * [JES] stated that it was accepting the tendered shares and was seeking additional shares to increase its investment in Conoco, consistent with the maximum amount of the * * * [JES] offer and the announced results of DuPont's offer for Conoco.
>
> In light of the DuPont announcement, * * * [JES] added, each Conoco share acquired by * * * [JES] may be exchanged for or converted into 1.7 shares of DuPont common stock, either pursuant to the DuPont tender offer or upon the subsequent merger with a DuPont subsidiary which DuPont has previously announced.

On August 7, 1981, the JES tender offer expired with approximately 28 million Conoco shares (32 percent of the Conoco shares outstanding at the commencement of the

DuPont tender offer) having been tendered to JES Tenderor for cash at $92 per share. JES Tenderor ultimately purchased 24,625,750 shares of Conoco for $92 per share and 3,113,025 shares for $91.35 per share, with an aggregate cost of $2,557,738,302.25.

Because Mobil never received tenders for 51 percent of Conoco's shares, under the terms of its tender offer, it did not purchase any of the Conoco shares tendered to it.

JES Tenderor and DuPont Tenderor were acting independently of one another and pursuant to competing tender offers.

### JES' Tender of Its Conoco Shares

A press release dated August 11, 1981, announced that the board of directors of SCL had authorized the exchange of the Conoco shares held by JES Tenderor pursuant to the terms of the DuPont tender offer. The release quoted JES chairman and chief executive officer Edgar Bronfman as stating:

> This is an appropriate time to congratulate the management and Board of DuPont on the success of their offer for Conoco. While Seagram would have been delighted to have won 51 percent of Conoco, we are pleased at the prospect of becoming a large stockholder of the combined DuPont and Conoco. We believe it will be a very strong company, with a fine future.

On August 17, 1981, JES Tenderor tendered its shares of Conoco in exchange for shares of DuPont common stock on the basis of an exchange ratio of 1.7 shares of DuPont for each Conoco share. JES Tenderor formally elected to receive DuPont stock in exchange for its Conoco stock and received 47,400,377 shares of DuPont common stock. On the exchange date, the mean high and low per share price of DuPont common stock traded on the NYSE was $43. The schedule-13D filed by JES with the SEC upon the exchange of the Conoco shares for DuPont shares stated, in part, that

> The purpose of the exchange of the Conoco Shares for the DuPont Shares is to enable * * * [JES] to obtain a substantial equity interest in DuPont. Based upon publicly available information, * * * [JES] believes that it will be the largest DuPont shareholder. Accordingly, * * * [JES] may seek representation on DuPont's Board of Directors.

*The Merger*

On August 17, 1981, the common shareholders of DuPont approved the planned merger and the issuance of additional DuPont common shares. The merger was voted in favor of by 75.3 percent of the outstanding DuPont shares and was voted against by 5.9 percent of the outstanding DuPont shares.

On September 30, 1981, Conoco merged into DuPont Tenderor. The merger was approved by a shareholder vote in which 99,100,246 Conoco shares (97 percent) were voted in favor and 89,889 Conoco shares (less than 0.1 percent) were voted against the merger. The 5,491,896 Conoco shares (6 percent of the shares outstanding at the commencement of the DuPont tender offer) not tendered were exchanged for DuPont stock pursuant to the merger. Neither petitioner, JES, nor JES Tenderor commenced any legal action with respect to the merger.

Immediately following the merger, JES Tenderor owned 20.2 percent of the outstanding common stock of DuPont. Thereafter, petitioner purchased additional shares of DuPont common stock and increased its interest in DuPont to 24.5 percent, which interest it has maintained to date. Petitioner's total cost for this stock was approximately $2,892,297,000 and its total market value, as of January 31, 1992, was approximately $7,635,300,000.

*Summary of Conoco Share Trades*

After the June 10, 1981, redemption of the Conoco stock acquired by Dome in its tender offer, there were approximately 86 million shares of Conoco stock, which shares remained outstanding until Conoco merged into DuPont Tenderor on September 30, 1981. From August 1 to August 7, 1981, JES Tenderor accepted tenders of 27,738,775 shares of Conoco stock for cash and began purchasing such shares on August 1, 1981. On August 5, 1981, DuPont Tenderor accepted approximately 39.6 million shares of Conoco stock, which were tendered to it for $98 cash per share, an aggregate cash amount of $3,880,800,000. On August 17, 1981, DuPont Tenderor accepted approximately 40.9 million shares of Conoco stock in exchange for stock in DuPont, including the 27,738,775 shares of Conoco stock which JES Tenderor had purchased for cash pursuant to its tender offer.

On September 30, 1981, 5,491,896 shares of Conoco were exchanged for DuPont stock pursuant to the merger. Of the Conoco shareholders who held the 85,991,896 Conoco shares outstanding on July 5, 1981, the holders of not more than 18,653,121 of such shares acquired an ownership interest in DuPont by reason of the DuPont tender offer and merger. Of the holders of Conoco shares who either transferred their Conoco shares to DuPont Tenderor pursuant to its tender offer which closed on August 17, 1981 (including JES Tenderor), or who exchanged Conoco shares in the merger, the holders of 46,391,896 of such shares acquired an ownership interest in DuPont by reason of the DuPont tender offer or the merger, although some Conoco shareholders who received DuPont stock in the tender offer may have sold their DuPont stock prior to the merger.

DuPont treated the tender offer and merger as a tax-free reorganization for Federal income tax purposes and filed its tax return for its 1981 taxable year accordingly. DuPont and Conoco advised former Conoco shareholders who had exchanged their stock for DuPont stock in either the exchange portion of the tender offer or the merger that they had no taxable gain or loss.

When the dust had settled at the completion of the Conoco-DuPont merger on September 30, 1981, approximately 78 percent of the Conoco stock had changed hands for cash pursuant to the competing JES and DuPont tender offers, yet approximately 54 percent of the Conoco equity (in addition to the optioned shares) remained in corporate solution in the form of DuPont shares received in exchange for Conoco shares.

Petitioner tendered each share of Conoco stock, for which it had paid about $92 per share, in exchange for 1.7 shares of DuPont stock, each share of which had a mean market value on the August 17, 1981, tender date of about $43 or approximately $73.10 for each 1.7-share unit.

*Petitioner's Financial Accounting*

Petitioner did not report a loss for financial accounting purposes as a result of its exchange of Conoco stock for DuPont stock. Petitioner ascribed its carrying cost for its Conoco stock to the DuPont stock which it received in

exchange. Immediately following the merger, petitioner owned 20.2 percent of the outstanding common stock of DuPont. As of December 31, 1992, petitioner owned approximately 24.5 percent. Under Generally Accepted Accounting Principles, petitioner is entitled to account for its interest in DuPont under the equity method and reports a pro rata portion of DuPont's earnings as its own for financial accounting purposes under the equity method. As of the time this case was submitted, petitioner was the largest DuPont shareholder and had representation on DuPont's board of directors roughly in proportion to its interest in DuPont.

The amount of the loss petitioner claims to have realized (whether or not recognizable) upon the exchange of Conoco stock for DuPont stock was $530,410,896.

## Discussion

The ultimate issue for decision is whether, for tax purposes, petitioner had a recognized loss upon the exchange of its Conoco stock for DuPont stock. Whether such a loss is to be recognized depends upon the effect to be given section 354(a)(1) under the above facts. Section 354(a)(1) provides:

SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

Thus, if DuPont, DuPont Tenderor, and Conoco were parties to a reorganization, and if the statutory merger of Conoco into DuPont Tenderor was in pursuance of a plan of reorganization, then no loss is to be recognized by petitioner upon the exchange of its Conoco stock for DuPont stock.

Petitioner challenges the validity of the putative reorganization on several grounds, discussed subsequently, whereas respondent argues in support of the reorganization. While petitioner basically questions the existence of the kind of plan of reorganization envisioned by the statute, petitioner does not challenge the status of DuPont, DuPont Tenderor, and Conoco as parties to a reorganization, assuming that in fact there was one.

In form, at least, DuPont's acquisition of Conoco (during the course of which petitioner effected the aforementioned exchange) was what the commentators Bittker and Eustice have called a "creeping multistep merger"; that is, a merger which is in their words "the culminating step in a series of acquisition transactions, all looking to the ultimate absorption of the target company's properties when control has been obtained by the acquiring corporation." Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.12.3, at 14–35 (5th ed. 1987); see *King Enters., Inc. v. United States,* 189 Ct. Cl. 466, 418 F.2d 511 (1969); see also MacLean, "Creeping Acquisitions", 21 Tax L. Rev. 345 (1966).

In the discussion that follows, we occasionally for convenience refer to DuPont and its facilitating subsidiary DuPont Tenderor interchangeably, since DuPont Tenderor is, of course, simply DuPont's cat's-paw in the transactions under scrutiny.

Section 368(a) provides in relevant part:

SEC. 368(a). REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

(A) A statutory merger or consolidation;

\* \* \* \* \* \* \*

(2) SPECIAL RULES RELATING TO PARAGRAPH (1).—

\* \* \* \* \* \* \*

(D) USE OF STOCK OF CONTROLLING CORPORATION IN PARAGRAPH (1)(A) AND (1)(G) CASES.—The acquisition by one corporation, in exchange for stock of a corporation (referred to in this subparagraph as "controlling corporation") which is in control of the acquiring corporation, of substantially all of the properties of another corporation shall not disqualify a transaction under paragraph (1)(A) or (1)(G) if—

(i) no stock of the acquiring corporation is used in the transaction, and

(ii) in the case of a transaction under paragraph (1)(A), such transaction would have qualified under paragraph (1)(A) had the merger been into the controlling corporation.

Section 1.368–2(g), Income Tax Regs., provides:

(g) The term "plan of reorganization" has reference to a consummated transaction specifically defined as a reorganization under section 368(a). The term is not to be construed as broadening the definition of "reorganization" as set forth in section 368(a), but is to be taken as limiting the

nonrecognition of gain or loss to such exchanges or distributions as are directly a part of the transaction specifically described as a reorganization in section 368(a). Moreover, the transaction, or series of transactions, embraced in a plan of reorganization must not only come within the specific language of section 368(a), but the readjustments involved in the exchanges or distributions effected in the consummation thereof must be undertaken for reasons germane to the continuance of the business of a corporation a party to the reorganization. Section 368(a) contemplates genuine corporate reorganizations which are designed to effect a readjustment of continuing interests under modified corporate forms.

There appears to be no dispute that the merger of Conoco into DuPont Tenderor complied with the requirements of Delaware law, thus meeting the description of a "reorganization" in section 368(a)(1)(A) in that there was a "statutory merger or consolidation", and that the exchange of DuPont common stock by DuPont Tenderor for Conoco common stock fits within the provisions of section 368(a)(2)(D). Petitioner maintains, however, that the exchange of its Conoco common stock for DuPont common stock was not done in pursuance of a plan of reorganization, as required by section 354, and that therefore a loss is to be recognized on the exchange.

We first address the question of whether Conoco's merger into DuPont was pursuant to a plan of reorganization, as contemplated by section 354(a)(1). Simply stated, petitioner claims that DuPont's tender offer and the subsequent merger squeezing out the remaining Conoco shareholders were separate and independent transactions. Consequently, petitioner argues that the exchange of Conoco stock for DuPont stock pursuant to DuPont's tender offer rather than pursuant to the merger could not have been in pursuance of a plan of reorganization, as section 354 requires.

Petitioner argues at length that (1) the DuPont tender offer had independent significance from the DuPont-Conoco merger in that the tender offer had a separate business motive apart from the merger; separate and permanent legal, economic, and business consequences; and a strategically critical role in the contest for control of Conoco; (2) there were material conditions and contingencies which could have been serious impediments to the consummation of the merger; (3) the tender offer was a legally binding contract that closed prior to the merger and irrespective of whether the subsequent merger would ever close; and (4) the tender offer, not the merger, was the essential transaction by which

DuPont obtained control of Conoco. We can agree with most of these assertions, and yet disagree with petitioner's conclusion that there was no reorganization. Since petitioner's points are all variations on a single theme, we will deal with them together as a single issue.

Petitioner insists that the DuPont tender offer was a legally binding contract that closed prior to the merger and irrespective of whether the subsequent merger would even be consummated. Petitioner argues that the tender offer was "plainly not a 'step' engaged in by DuPont for tax planning reasons. Rather the tender offer was the essential transaction by which DuPont obtained control of Conoco."

Petitioner asks us to apply the rationale of *Esmark, Inc. v. Commissioner,* 90 T.C. 171 (1988), affd. without published opinion 886 F.2d 1318 (7th Cir. 1989), to sustain the argument that the DuPont tender offer, standing alone, controls the outcome of this case. However, *Esmark, Inc.* did not involve a reorganization, so the facts of that case are not apposite. Furthermore, the result in *Esmark, Inc.* is antithetical to petitioner's position in this case.

*Esmark, Inc.* involved a series of related transactions culminating in a tender offer and redemption of a part of the taxpayer's stock in exchange for certain property. The Commissioner, seeking to apply the step transaction doctrine, sought to recharacterize the tender offer/redemption as a sale of assets followed by a self-tender. While it is true that we held that each of the preliminary steps leading to the tender offer/redemption had an independent function, we also held that the form of the overall transaction coincided with its substance, and was to be respected. In the case before us, petitioner would have us respect the independent significance of DuPont's tender offer, but disregard the overall transaction, which included the merger. That result would, of course, be inconsistent as an analogy with the result in *Esmark, Inc.* We therefore decline petitioner's request that we apply *Esmark, Inc.* to the facts of this case.

Petitioner makes much of the fact that there were significant contingencies that might have prevented the completion of the merger even after the tender offer had closed, citing in support, among other cases, *Dunlap & Associates, Inc. v. Commissioner,* 47 T.C. 542 (1967). But the facts of *Dunlap & Associates, Inc.* are far from apposite to those of this case.

As preliminary steps looking toward a public offering of its stock, the taxpayer in *Dunlap & Associates, Inc.* undertook to change its State of incorporation, in what we held to be an "F" reorganization (section 368(a)(1)(F)), and to acquire by an exchange of stock, in what we held to be two "B" reorganizations (section 368(a)(1)(B)), the minority holdings in two of its subsidiaries. For reasons not germane here, the taxpayer argued that there was "one integrated plan of reorganization", an argument we rejected since, among other things, "we [failed] to see how the end result would come within * * * any one of the definitions [of reorganization] contained in section 368(a)(1)." *Id.* at 551. In dictum, we also stated that the transactions were not interdependent because there was no "provision in the merger agreements that the transfer of the New York corporation's assets to * * * [taxpayer] would be undone if the minority stockholders were not responsive to the offers." *Id.* at 551.

Petitioner maintains that, as in *Dunlap & Associates, Inc.,* there were "significant legal contingencies that could well have resulted in DuPont's tender offer closing but not the merger." We list some of these from petitioner's memorandum of law in support of its motion for summary judgment (petitioner's memorandum):

1. After DuPont waived its precondition that it receive tenders of at least 51 percent of the Conoco shares, DuPont opened up the possibility, if its option to acquire 15,900,000 shares from Conoco were declared invalid, that it would not acquire enough Conoco stock to be able to effectuate the Merger.

2. Minority Conoco shareholders might successfully sue to enjoin the Merger on the grounds of fairness and breach of fiduciary duty.

3. The proposed Merger might not comply with applicable procedural and substantive requirements of Delaware law.

The fatal defect in petitioner's "contingencies" argument, however, is that whatever the contingencies (and *any* contemplated merger involving public companies like DuPont and Conoco is bound to be fraught with contingencies), the merger *did* in fact take place, just as contemplated in the DuPont/Conoco agreement.

As respondent correctly states in her memorandum of law in opposition to petitioner's motion for summary judgment and in support of respondent's motion for summary judgment (respondent's memorandum), taxation depends on actual

events, not on what might have happened. The Court of Appeals for the Ninth Circuit, in *Walt Disney Inc. v. Commissioner,* 4 F.3d 735, 740 (9th Cir. 1993), revg. 97 T.C. 221 (1991), on grounds other than a step transaction analysis, emphasized this point when it said: "That there were numerous conditions and contingencies which could have prevented the completion of the ["D"] reorganization is irrelevant; as the Commissioner asserts, the point is that the transaction was in fact closed as planned," pursuant to the taxpayer's "undisputed legal obligation" to do so. As discussed *infra,* DuPont had an indisputable legal obligation to complete the merger with Conoco, notwithstanding the possibility of intervening legal impediments, or contingencies, which in fact, never materialized.

The concept of "plan of reorganization", as described in section 1.368–2(g), Income Tax Regs., quoted above, is one of substantial elasticity. See *International Tel. & Tel. Corp. v. Commissioner,* 77 T.C. 60, 75 (1981), affd. per curiam 704 F.2d 252 (2d Cir. 1983). One commentator has stated that

The courts, and the Service where it has served its purposes, have adopted a functional approach to the problem that is undoubtedly consistent with congressional intent. They have held that a plan of reorganization is a series of transactions intended to accomplish a transaction described as a reorganization in section 368, regardless of how and in what form the plan is expressed and whether the parties intended tax-free treatment. * * * [Faber, "The Use and Misuse of the Plan of Reorganization Concept", 38 Tax L. Rev. 515, 523 (1983).]

The DuPont/Conoco agreement was the definitive vehicle spelling out the interrelated steps by which DuPont would acquire 100 percent of Conoco's stock. To explain the mechanics of the type of procedure utilized by DuPont and Conoco, respondent submitted an "Expert Affidavit" of Bernard S. Black. Black is a professor of law at the Columbia University School of Law, where he teaches courses in corporate finance, securities and capital markets regulations, and corporate acquisitions. He is coauthor of, among other treatises, The Law and Finance of Corporate Acquisitions. We found his affidavit, although on occasion somewhat argumentative, to be cogent, apparently well informed, and generally convincing.

In the affidavit, Professor Black states that

In substance, DuPont's bid for Conoco was a minor variant on a standard two-step acquisition, in which the parties sign a merger agreement that contemplates a first-step cash tender offer, to be followed by a second-step merger. The parties to an acquisition often use this transaction form, rather than a single-step merger (without a tender offer), because a tender offer can close faster than a merger, which increases the likelihood that the acquisition will be completed. * * *

Professor Black goes on to observe that "DuPont added a third step to this transaction form—an exchange offer of DuPont stock for Conoco stock."

The DuPont/Conoco agreement, which definitively states the terms for "the acquisition of [Conoco] by [DuPont Tenderor] (and thus by DuPont)", sets out the steps referred to by Professor Black in his affidavit—the series of transactions which in their totality were intended to accomplish a section 368 reorganization. Article I of the agreement relates to "THE OFFER", and provides the terms of the acquisition of Conoco stock by DuPont Tenderor in exchange for the combined cash/DuPont stock package.

Article II relates to "THE OPTION", granting DuPont Tenderor an option to purchase up to 15,900,000 shares of authorized but unissued Conoco stock.

Article III relates to "THE MERGER", and provides in part:

SECTION 3.01. (a) As promptly as practicable following the consummation or termination of the Offer, subject to the terms and conditions of this Agreement, the Company shall be merged into the Subsidiary in accordance with Delaware General Corporation Law. * * *

\* \* \* \* \* \* \*

(c) The parties hereto shall take all action necessary in accordance with applicable law and their respective Certificates of Incorporation and By-laws to cause such Merger to be consummated prior to March 31, 1982.

The agreement makes no provision for postclosing actions such as stock registration to facilitate sales by former Conoco shareholders of newly acquired DuPont stock. Cf., e.g., *Penrod v. Commissioner,* 88 T.C. 1415 (1987).

As we have previously noted, the agreement originally provided that the obligation of DuPont Tenderor to accept shares for exchange was, among other things, subject to the condition that at least 51 percent of Conoco's outstanding shares be tendered. Due to the exigencies created by the competing tender offers of petitioner and Mobil, DuPont sub-

sequently found it expedient to reduce the 51-percent minimum to 41 percent. However, on August 5, 1981, DuPont Tenderor exercised the option provided in the agreement to buy 15,900,000 authorized but unissued Conoco shares, which would give DuPont an absolute majority of Conoco shares.

It has been said that "reorganizations, like other commercial events, must have a discrete start and a finish." See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 12.21. [10]. Uncertainty in this regard can present questions as to whether various steps can be considered together as a unified transaction constituting a reorganization. See, e.g., *Commissioner v. Gordon,* 391 U.S. 83, 96 (1968); *King Enters., Inc. v. United States,* 189 Ct. Cl. 466, 418 F.2d 511, 514 (1969).

The agreement provides a discrete start and finish, and the record discloses no steps agreed to outside the agreement, or preagreement activity by DuPont or its shareholders, that would invalidate the contemplated reorganization. Cf., e.g., *Superior Coach of Fla., Inc. v. Commissioner,* 80 T.C. 895 (1983), discussed *infra.* We do not view DuPont's increase in the price it was willing to pay for the Conoco shares, or the reduction in the percentage of Conoco shares acceptable under the DuPont tender offer, to be vitiating steps, since both steps benefited the Conoco shareholders and were steps taken to assure the success of the plan of reorganization, not to enlarge it outside its initial confines.

In *Commissioner v. Gordon, supra* at 96, the Supreme Court held that the requirement that the character of a transaction be determinable means that "if one transaction is to be characterized as a 'first step' there must be a binding commitment to take the later steps." This requirement has been met. While DuPont's acquisition of control of Conoco by means of the tender offer unquestionably had economic significance, "independent" or not, and unquestionably was not a "meaningless step", DuPont and DuPont Tenderor were under a binding and irrevocable commitment to complete the culminating merger—the second step—upon the successful completion of the DuPont tender offer—the first step.

Petitioner argues that DuPont had a "plan" to engage in a series of transactions that "ultimately may include a reorganization", but not a "plan of reorganization". For reasons

already discussed, we disagree. We hold that, because DuPont was contractually committed to undertake and complete the second step merger once it had undertaken and completed the first step tender offer, these carefully integrated transactions together constituted a plan of reorganization within the contemplation of section 354(a).

Petitioner also argues that even if the DuPont tender offer and merger were to be treated as an integrated transaction, the merger does not qualify as a reorganization because it fails the "continuity of interest" requirement.

In *Penrod v. Commissioner, supra* at 1427–1428, we stated that

It is well settled that, in addition to meeting specific statutory requirements, a reorganization under section 368(a)(1)(A) must also satisfy the continuity of interest doctrine. See sec. 1.368–1(b), Income Tax Regs. * * * Because the reorganization provisions are based on the premise that the shareholders of an acquired corporation have not terminated their economic investment, but have merely altered its form, the continuity of interest doctrine limits the favorable nonrecognition treatment enjoyed by reorganizations to those situations in which (1) the nature of the consideration received by the acquired corporation or its shareholders confers a proprietary stake in the ongoing enterprise, and (2) the proprietary interest received is definite and material and represents a substantial part of the value of the property transferred. See generally *Helvering v. Alabama Asphaltic Limestone Co.,* 315 U.S. 179 (1942); *LeTulle v. Scofield,* 308 U.S. 415 (1940); *John A. Nelson Co. v. Helvering,* 296 U.S. 374 (1935); *Helvering v. Minnesota Tea Co.,* 296 U.S. 378 (1935); *Pinellas Ice & Cold Storage Co. v. Commissioner,* 287 U.S. 462 (1933); see also sec. 1.368–2(a), Income Tax Regs.; B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.01, at 14–4 (4th ed. 1979). [Fn. ref. omitted.]

On the date of the Conoco/DuPont agreement, July 6, 1981, there were approximately 85,991,896 Conoco shares outstanding. Petitioner is essentially arguing that because it acquired approximately 32 percent of these shares for cash pursuant to its own tender offer, and DuPont acquired approximately 46 percent of these shares for cash pursuant to *its* tender offer, the combined 78 percent of Conoco shares acquired for cash after the date of the agreement destroyed the continuity of interest requisite for a valid reorganization. We think petitioner's argument, and the logic that supports it, miss the mark.

Pursuant to its two-step tender offer/merger plan of reorganization, DuPont acquired approximately 54 percent of the "initial" 85,991,896 shares of Conoco stock in exchange for DuPont stock, which included petitioner's recently acquired Conoco shares that it tendered pursuant to DuPont's tender offer. If the 54 percent had been acquired by DuPont from Conoco shareholders in a "one-step" merger type acquisition, there would be little argument that continuity of interest had been satisfied. Sec. 368(a)(1)(A).

In *Helvering v. Minnesota Tea Co.,* 296 U.S. 378 (1935), the Supreme Court held that an equity interest in the transferee equal to about 56 percent of the value of the transferor's assets was adequate. In *John A. Nelson Co. v. Helvering,* 296 U.S. 374 (1935), the Supreme Court considered 38-percent equity continuity to be sufficient. For advance ruling purposes, the IRS considers a 50-percent equity continuity of interest, by value, to be sufficient. Rev. Proc. 77–37, 1977–2 C.B. 568. On the other hand, the U.S. Court of Appeals for the Fifth Circuit has held that a 16.4-percent continuing common stock interest, representing less than 1 percent of the total consideration (consisting of cash, bonds, and common stock) paid by the acquiring corporation, did not evidence sufficient continuity of interest to bring a transaction within the requirements of the predecessor of section 368(a)(1)(A). *Southwest Natural Gas Co. v. Commissioner,* 189 F.2d 332 (1951), affg. 14 T.C. 81 (1950).

Where sufficient continuity is lacking, the acquired corporation will not be a "party to a reorganization", thus causing the overall transaction to fail as a reorganization under section 368(a)(1)(A).

Section 368(b) provides in relevant part:

SEC. 368(b). PARTY TO A REORGANIZATION.—For purposes of this part, the term "a party to a reorganization" includes—
  (1) a corporation resulting from a reorganization, and
  (2) both corporations, in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another.

In the case of a reorganization qualifying under paragraph (1)(A) * * * of subsection (a) by reason of paragraph (2)(D) of that subsection, the term "a party to a reorganization" includes the controlling corporation referred to in such paragraph (2)(D). * * *

Thus the question petitioner raises is whether there is suffi-cient continuity of interest so as to qualify Conoco, DuPont, and DuPont Tenderor (by virtue of section 368(a)(2)(D)) as parties to a reorganization under this section.

The parties stipulated that petitioner and DuPont, through their wholly owned subsidiaries, were acting independently of one another and pursuant to competing tender offers. Fur-thermore, there is of course nothing in the record to suggest any prearranged understanding between petitioner and DuPont that petitioner would tender the Conoco stock pur-chased for cash if petitioner by means of its own tender offer failed to achieve control of Conoco. Consequently, it cannot be argued that petitioner, although not a party to the reorga-nization, was somehow acting in concert with DuPont, which *was* a party to the reorganization. If such had been the case, the reorganization would fail because petitioner's cash pur-chases of Conoco stock could be attributed to DuPont, thereby destroying continuity.

The cases cited by petitioner in support of its argument that DuPont's plan of reorganization failed for lack of con-tinuity of interest are not germane. For example, petitioner quotes *Superior Coach of Fla., Inc. v. Commissioner,* 80 T.C. at 904, as stating that "[the continuity of interest require-ment is] based upon the fundamental statutory purpose of providing for the carryover of tax attributes only if the reorganization is distinguishable from a sale." In *Superior Coach of Fla., Inc.,* the majority shareholders of P purchased all of the shares of T and merged T into P. We held that the P shareholders' acquisition of the T stock was "inextricably interwoven" with the intent to effect the merger, and since the "historic shareholders" of T retained no proprietary interest in P, the merger did not qualify as a reorganization under section 368(a)(1)(A). In other words, the reorganization failed because the majority shareholders of P were acting on its behalf when they bought the T stock for cash, and there was no continuity of interest on the part of the acquired cor-poration's previous shareholders. In the case before us, DuPont's shareholders did not purchase Conoco stock for cash (or for any other consideration) to facilitate the merger, and except for approving the plan of reorganization and the merger did not act on DuPont's behalf. *Superior Coach of Fla., Inc.* is therefore not apposite on its facts.

Petitioner cites *Yoc Heating Corp. v. Commissioner,* 61 T.C. 168, 177 (1973), for the proposition that continuity requires looking at shareholders "immediately prior to the inception of the series of transactions" in an integrated transaction. Again, we look at the facts: R, the acquiring corporation, purchased for cash over 85 percent of the stock of O, and then caused O to transfer its assets, subject to its liabilities, to R's wholly owned subsidiary, N. N issued 1 share of its stock to R in exchange for every 3 shares of O held by R plus cash to be paid to the minority shareholders of O.

The Commissioner argued in *Yoc Heating* that the taxpayer's series of transactions constituted a reorganization within the meaning of section 368(a)(1)(F) or, alternatively, section 368(a)(1)(D). We held, however, that the acquisition by N of O's assets constituted a purchase under the "integrated transaction" (step transaction) doctrine, rather than a reorganization under either section proposed by the Commissioner. *Id.* at 177–178. Thus *Yoc Heating's* comparison of stock ownership immediately prior to and immediately after the series of transactions is perfectly appropriate to the facts of that case, where the acquiring corporation acquired control of the target for cash and then effected the corporate combination, because the shareholders of O before the acquisition by R lacked the requisite continuing interest in the affairs of O after the acquisition.

Petitioner also attempts to apply cases involving prearranged postacquisition sales of acquiring corporation stock by shareholders of the acquired corporation. Petitioner points out that these cases hold that a sale that was not pursuant to the plan of reorganization was fatal to continuity of interest where the sale "[established an] intent to divest * * * [the old stockholders] of their proprietary interest." *Heintz v. Commissioner,* 25 T.C. 132, 143 (1955). Petitioner also cites *McDonald's Restaurants of Illinois, Inc. v. Commissioner,* 688 F.2d 520 (7th Cir. 1982), revg. 76 T.C. 972 (1981), which involved a similar fact pattern and reached a result parallel with that in *Heintz.*

By citing *Heintz* and *McDonald's Restaurants of Illinois,* petitioner is attempting to draw an analogy between the postreorganization sales of these cases and the sales by Conoco shareholders to petitioner during the course of the

reorganization transactions in this case. We quote petitioner's memorandum:

The Commissioner clearly would agree that there would be insufficient continuity if the public shareholders who exchanged Conoco shares for DuPont shares sold their shares of DuPont to Seagram the day after the merger. It is both inequitable and illogical to count dispositions to third parties the day after an alleged reorganization as in *Heintz* and *McDonald's,* against continuity, but not to similarly count actual dispositions made in the allegedly integrated reorganization period immediately prior to the merger.

We do not believe petitioner's analogy is appropriate, because in a case such as the one before us we must look not to the identity of the target's shareholders, but rather to what the shares represented when the reorganization was completed. In this case, a majority of the old shares of Conoco were converted to shares of DuPont in the reorganization, so that in the sense, at least, that a majority of the consideration was the acquiring corporation's stock, the test of continuity was met. In this aspect of the case step transaction and continuity questions would have arisen only had there been some preexisting intention or arrangement for the disposal of the newly acquired DuPont shares, but there were none.

Respondent points out, correctly we believe, that the concept of continuity of interest advocated by petitioner would go far toward eliminating the possibility of a tax-free reorganization of any corporation whose stock is actively traded. Because it would be impossible to track the large volume of third party transactions in the target's stock, all completed transactions would be suspect. Sales of target stock for cash after the date of the announcement of an acquisition can be neither predicted nor controlled by publicly held parties to a reorganization. A requirement that the identity of the acquired corporation's shareholders be tracked to assume a sufficient number of "historic" shareholders to satisfy some arbitrary minimal percentage receiving the acquiring corporation's stock would be completely unrealistic.

Such a mandate to look only to historic shareholder identity to determine continuity was rejected by the Supreme Court in *Helvering v. Alabama Asphaltic Limestone Co.,* 315 U.S. 179 (1942). In *Alabama Asphaltic,* unsecured noteholders of an insolvent corporation commenced a bank-

ruptcy proceeding against the corporation. The noteholders bought the corporate assets from the trustee and transferred them to a newly formed corporation in exchange for its stock. In discussing these facts, the Supreme Court stated:

When the equity owners are excluded and the old creditors become the stockholders of the new corporation, it conforms to realities to date their equity ownership from the time when they invoked the processes of the law to enforce their rights of full priority. *At that time they stepped into the shoes of the old stockholders.* The sale "did nothing but recognize officially what had before been true in fact." \* \* \*

\*   \*   \*   \*   \*   \*   \*   \*

Some contention, however, is made that this transaction did not meet the statutory standard because the properties acquired by the new corporation belonged at that time to the committee and not to the old corporation. That is true. *Yet, the separate steps were integrated parts of a single scheme. Transitory phases of an arrangement frequently are disregarded under these sections of the revenue acts where they add nothing of substance to the completed* affair. *Gregory v. Helvering,* 293 U.S. 465; *Helvering v. Bashford,* 302 U.S. 454. Here they were no more than intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan. [*Id.* at 184–185; citation omitted; emphasis added.]

In reaching this conclusion, the Supreme Court upheld the finding of a valid "A" reorganization by this Court. *Alabama Asphaltic Limestone Co. v. Commissioner,* 41 B.T.A. 324, 336 (1940), affd. 119 F.2d 819 (5th Cir. 1941), affd. 315 U.S. 179 (1942).

In the "integrated" transaction before us petitioner, not DuPont, "stepped into the shoes" of 32 percent of the Conoco shareholders when petitioner acquired their stock for cash via the JES competing tender offer, held the 32 percent transitorily, and immediately tendered it in exchange for DuPont stock. For present purposes, there is no material distinction between petitioner's tender of the Conoco stock and a direct tender by the "old" Conoco shareholders themselves. Thus, the requirement of continuity of interest has been met.

Petitioner extended its tender offer even after DuPont had been tendered a "significant majority" of the outstanding shares of Conoco and withdrawal rights had closed. At that time petitioner announced that it was accepting the shares tendered to it and "was seeking additional shares to increase

its investment in Conoco." And as we recited earlier, petitioner, in connection with its tender of its just-acquired Conoco stock, issued a press release quoting Edgar M. Bronfman, Seagram's chairman and CEO, as saying that Seagram was pleased at the prospect of becoming "a large stockholder of the *combined DuPont and Conoco.*" (Emphasis added.) We also noted that petitioner did not report a loss on the exchange of its Conoco stock for DuPont stock for financial accounting purposes. Instead, petitioner ascribed its carrying cost for its Conoco stock to the DuPont stock. None of these acts is consistent with the recognized loss petitioner claimed on its tax return.

For the reasons stated in this opinion, we hold that a loss cannot be recognized by petitioner on its exchange of Conoco stock for DuPont stock, made pursuant to the DuPont-Conoco plan of reorganization. To reflect this holding and concessions by the parties,

> *An order will be issued denying petitioner's motion for summary judgment and granting respondent's motion for summary judgment, and directing the parties to submit computations under Rule 155 in anticipation of a decision to be entered thereunder.*